[No. B178340. Second Dist., Div. Four. Sept. 25, 2007.]

STEPHEN SLESINGER, INC., Plaintiff and Appellant, v.
THE WALT DISNEY COMPANY, Defendant and Respondent.

COUNSEL

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Steven L. Mayer, Steven N. Sherr and Jerome B. Falk, Jr., for Plaintiff and Appellant.

O'Melveny & Myers, Alan Rader, Victor H. Jih, Justin M. Goldstein, Kevin L. Vick and Daniel M. Petrocelli for Defendant and Respondent.

## OPINION

**WILLHITE, Acting P. J.**—In this case of first impression in California, we hold that when a plaintiff's deliberate and egregious misconduct makes any sanction other than dismissal inadequate to ensure a fair trial, the trial court has inherent power to impose a terminating sanction.

In 1991, plaintiff Stephen Slesinger, Inc. (SSI), sued defendant the Walt Disney Company (Disney), alleging that Disney failed to pay certain royalties under its licensing agreement with SSI. That agreement granted Disney rights to exploit the Winnie the Pooh series of children's stories—rights that SSI's founder had obtained in 1930 from Pooh's creator, A.A. Milne. In 1992 or 1993, to assist in prosecuting its lawsuit, SSI hired an investigator to surreptitiously obtain Disney documents. Other than a purported admonition to obey the law, SSI provided no direction or supervision for the investigator's activities. Working at least until 1995, the investigator took thousands of pages belonging to Disney, including documents marked privileged and confidential. He obtained the documents by breaking into an uncertain number of Disney office buildings and secure trash receptacles, and by trespassing onto the secure facility of the company with which Disney had contracted to destroy its confidential documents. The documents were passed on to SSI's attorneys and principals, who reviewed them, but kept no records of the documents they received or of those they discarded. Until 2002, SSI concealed the investigator's activities from Disney and the court. In 2004, following an evidentiary hearing on a motion by Disney for a terminating sanction, the trial court concluded that no lesser sanction could protect Disney against SSI's use of illicitly obtained information. Therefore, as an exercise of its inherent power, the court dismissed SSI's lawsuit with prejudice.

On SSI's appeal from the terminating sanction, we conclude that California trial courts have inherent power to issue a terminating sanction when a plaintiff's misconduct is deliberate, is egregious, and makes lesser sanctions inadequate to ensure a fair trial. Because substantial evidence shows that SSI's misconduct meets this standard, we also conclude that the trial court did not abuse its discretion in dismissing SSI's case as an exercise of the court's inherent power.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Litigation*

British author A.A. Milne created the Winnie the Pooh series of children's stories. In 1930, Stephen Slesinger acquired from Milne the rights to commercially exploit the works in the United States and Canada. Stephen

Slesinger formed a corporation, SSI, to which he assigned the Pooh rights. In 1961, SSI licensed certain rights of commercial exploitation to Disney. SSI and Disney modified their licensing agreement several times. In 1983, they executed a new contract, which became the focus of the instant litigation.

In February 1991, SSI sued Disney for breach of contract, fraud, and declaratory relief. In the operative third amended complaint, SSI alleged that Disney breached its contractual obligations to account and pay for its exploitation of the Pooh rights under the 1983 agreement, including sales of Pooh merchandise. SSI also alleged that during the negotiations leading to the 1983 agreement Disney misrepresented, among other things, the items for which it would pay royalties, and that Disney thereafter misrepresented its compliance with its contractual obligations to account for royalties. In its declaratory relief claim, SSI sought a declaration that it could terminate the contract based on Disney's breaches.

Lengthy, bitter litigation followed, occasioned by claims and counter-claims of misconduct. In 2001, SSI obtained evidentiary and monetary sanctions against Disney for destroying substantial portions of the files of Vincent H. Jefferds, a senior Disney vice-president who was Disney's princi-pal representative in negotiating the 1983 licensing agreement. A key dispute in SSI's lawsuit involves representations allegedly made by Jefferds during the negotiations.

Having obtained sanctions against Disney, however, SSI fell victim to its own litigation abuses. In 2003, Disney moved for a terminating sanction against SSI, alleging that SSI had committed pervasive misconduct. In February 2004, the trial court (a different judge from the one who had sanctioned Disney) held a five-day evidentiary hearing on Disney's motion. The evidence was complex and conflicting; it included, among other things, live testimony, deposition testimony, witness declarations, correspondence between the parties, and prior discovery pleadings. What emerged was a portrait of litigation misconduct run riot, involving SSI's employment of an investigator, Terry Lee Sands, to take documents from Disney facilities and trash receptacles as well as the secure facility of the document destruction firm retained by Disney. We summarize the entire record under the applicable standard of review: in the light most favorable to the trial court's ruling terminating SSI's lawsuit, drawing all inferences in support of the trial court's ruling which are reasonably supported by the evidence. (See *Laguna Auto Body v. Farmers Ins. Exchange* (1991) 231 Cal.App.3d 481, 487, 491 [82 Cal.Rptr. 530] (*Laguna*).)

### 2. *SSI's Principals and Agents, and the Hiring of Terry Lee Sands*

SSI is a family-run corporation. During the period relevant to this appeal, its sole corporate officer (President) and sole board member was Shirley Slesinger Lasswell, widow of SSI's founder Stephen Slesinger. Lasswell was responsible for managing SSI. She lived in Florida, and kept SSI's Winnie the Pooh files in her office there. Lasswell died while this appeal was pending.

SSI's sole shareholder is Pati Slesinger, Lasswell's daughter by Stephen Slesinger. Pati Slesinger managed SSI's lawsuit against Disney from the inception, keeping in close contact with Lasswell.

One of SSI's agents was David Bentson, Pati Slesinger's husband.[1] Bentson performed many tasks to assist SSI in its lawsuit, and worked directly with Terry Lee Sands, the investigator whose conduct lies at the heart of Disney's sanction motion.

Sands was never a licensed private investigator. Nonetheless, in 1992 or 1993 he was working for the Nick Harris Detective Agency when the agency was hired by SSI's then attorney, Marshall Morgan, to work on SSI's lawsuit.[2] Within a month, Sands began working directly with David Bentson and Attorney Morgan. His assignment was to help SSI prosecute its lawsuit by surreptitiously obtaining Disney documents.

Sands's employment lasted at least until 1995, and probably longer.[3] Based on the advice of SSI's counsel, Bentson admonished Sands to "make sure what you're doing is legal and that you do it by the book." Bentson, however, took no steps to ensure that Sands obeyed the admonition. As Bentson

---

[1] The two legally separated sometime between 1997 and 1998.

[2] During this lawsuit, SSI has been represented by at least 10 law firms. When Sands was hired, SSI was represented by two firms: Morgan, Wenzel & McNicholas (the firm associated with Marshall Morgan), and Girardi & Keese. These firms represented SSI from March 1992 *until May 1995*. Thereafter, SSI was represented by Manatt, Phelps & Phillips, LLP (1995 to 1997), McCaimbridge, Deixler & Marmaro, LLP (1997–2000), Proskauer Rose LLP (2000), Greenberg Glusker Fields Claman Machtinger & Kinsella LLP (2000 to 2003), Jones Day (Aug. through Dec. 2003), Hancock, Rothert & Bunshoft, LLP, and Cochran, Cherry, Givens & Smith, P. C. (Dec. 2003 through dismissal of SSI's case in 2004), and Howard, Rice, Nemerovski, Canady, Falk & Rabkin (May 2004 through present).

[3] In an October 2002 declaration, Sands claimed that he only worked for SSI from 1992 to 1995. Similarly, Pati Slesinger testified at her April 2003 deposition that Sands "stopped taking" Disney documents in 1995. However, as we later discuss, in September 2003, SSI produced the so-called "June 7, 2002 File"—a file folder labeled "Documents Received from Terry Sands on *6/7/02*." (Italics added.) The existence of this file, with its label, suggested that Sands's employment lasted long past 1995. At the February 2004 sanction hearing, Sands testified that SSI had rehired him around June 2002.

testified at the sanction hearing, "That wasn't my job. . . . All I did was pay his bills . . . [and] receive[] documents." Bentson would pass the documents delivered by Sands on to SSI's attorneys. He also reviewed at least some of them. Those he believed might be of interest to Lasswell he faxed to her in Florida. In his sanction hearing testimony, he did not know how many documents he faxed to Lasswell: "It could have been two, it could have been five." Bentson and Pati Slesinger also reviewed some of the documents together at the offices of SSI's lawyers.

With no supervision by SSI, Sands was free to obtain Disney documents as he saw fit. Although SSI first employed Sands in 1992 or 1993 to take Disney documents, it did not reveal that fact until March 2002. In the interim, Disney's knowledge of Sands's activities evolved by starts and spurts, beginning with two anonymous telephone calls received by Disney security in June 1994.

### 3. *The Anonymous June 1994 Calls*

Disney security received the first anonymous call on June 1, 1994. According to the report of the call prepared by a Disney security officer, the caller said that "he worked for a David B. (unknown last name)" and "worked with a Terry Lee Sands." The caller explained that "he and Terry knew when Disney had their pick-up days for trash and went to their dumpster locations, broke in and took copies of documents that included contracts and royalties for the animated feature Winnie The Poo[h]. . . . [T]hey would take paperwork from locations in Northridge, Burbank, Glendale and trash cans on Flower Street. [¶] . . . [T]here was even one incident where they were able to get [past] the security guard at the Olive Building[,] enter some of the offices and take documents (i.e., contracts) off the desks." The caller said that he was giving Disney this information because he had not been paid for his services.

The second call occurred two weeks later, on June 14, 1994. According to the security report, the caller reiterated that "he and Terry Lee Sands were hired by David Ben[t]son/Brenner to go through Disney trash and take contracts, papers and other documents relating to a court case going on now involving licensees, contracts and underpayment of royalties by Disney for 'Winnie the Pooh' items. . . . [T]hey were able to obtain information that would be harmful to Disney if it ever came out." The caller said that he was "upset" because "David and Terry" had learned of his first call and "were after him."

Disney security investigated the calls, but found no reports that documents were missing. Further, a "personnel history" on Terry Lee Sands produced no information. Therefore, Disney security placed the investigation "in abeyance" awaiting further developments.

Disney did not learn the identity of the anonymous caller until November 2002, when it deposed Richard Dale Holman, Sr., one of Terry Lee Sands's associates. In his deposition testimony, Holman, Sr., admitted that he had made the calls.

### 4. SSI's Possession of the Restricted Items List

After Disney security's 1994 inquiry, the next significant development occurred in October 1997. Then, in a letter to Disney attorneys that served as a prelude to discovery litigation, SSI's counsel revealed that SSI had "recently found" certain documents in its file, and had "no record as to the source." The documents were pages from the "Restricted Items List," a 278-page document maintained by Disney's in-house counsel. The document summarized information relating to Disney's exclusive licenses with third parties.

As created by Disney, the cover page of the Restricted Items List declared the document to be confidential. Further, the document included a 24-page section labeled "Corporate Participants." A footer at the bottom of each page of this section stated: "CONFIDENTIAL—For Internal Use Only." The pages disclosed by SSI, however, did not include the cover page or any page bearing the confidentiality footer.

Characterizing the pages as "privileged internal documents," Disney demanded their return and an explanation for SSI's possession of them. In a series of correspondence, SSI's attorneys refused to return the documents, denied that SSI had any knowledge about how it came to possess them, and filed a motion to require Disney to turn over more such documents. SSI asserted, among other things, that nothing on the documents indicated that they were privileged or confidential, or that Disney treated them as such.

On October 27, 1997, Disney deposed Shirley Lasswell.[4] In her deposition testimony, Lasswell testified that she had never heard of Terry Lee Sands. She denied having hired an investigator "with respect to Winnie the Pooh issues," and denied having authorized anyone in her family to do so. Asked if she knew SSI was taking documents from Disney offices and trash, she replied: "I

---

[4] Lasswell was unavailable to testify at the sanction hearing. Only her deposition testimony was introduced at the hearing.

don't know where you got that from. I don't know anything like that. I don't recall anything like that." Confronted with a copy of the Restricted Items List recently produced by SSI, Lasswell testified that she did not recognize the documents and did not know what they were.

After Lasswell's October 1997 deposition, Lasswell asked Pati Slesinger why she had been questioned about SSI's use of an investigator to take documents. Slesinger told her that an investigator had been retained to go through Disney's "garbage."

Because SSI refused to return the confidential documents from the Restricted Items List, Disney moved for a protective order in March 1998. SSI's opposition to that request reiterated that it had no reason to believe the documents were confidential and insisted it did not know how it obtained them. Before the motion was heard, however, SSI agreed to return "all copies" it had. Accepting that representation, Disney took its motion for a protective order off calendar.

### 5. SSI's Possession of the Patterson Memorandum and the Kaplan Note

In November 1999, SSI revealed to Disney that it possessed the so-called "Patterson Memorandum" and the "Kaplan Note."

The Patterson Memorandum was written on Disney letterhead by Thomas Patterson, a Disney accountant, to Carrie Stone, Disney's vice-president of merchandising. The memorandum is undated. However, Carrie Stone worked for Disney only from October 1995 to May 1998. Therefore, the memorandum was written sometime during that period, at least four and a half years after SSI filed suit in February 1991.

In the memorandum, Patterson requested "a full breakdown on all Pooh merchandising for the years '85 to '90, to complete [his] research for Corporate Legal." He then stated: "There appears to be faulty accounting at best, on the audits we discussed. There is also a tremendous amount of returned goods I can not account for. It appears most records have been stored on disk and removed from the AS-400 system."

The "Kaplan Note" is handwritten, dated October 8, on Disney letterhead. Its designation comes from the notation that a copy was sent to Larry Kaplan, a Disney attorney. The note reads: "I think it would be advantageous on our part if we moved all the Slesinger files to our Southern location K-3."

When produced by SSI, neither the Patterson Memorandum nor the Kaplan Note bore a Bates stamp that would indicate that Disney had produced it in discovery. Moreover, as Disney later learned, SSI had redacted fax transmission headers showing that the Kaplan Note had been sent from Slesinger's office to SSI's counsel—a fax transmission consistent with Bentson's practice of receiving documents from Sands, and faxing them to SSI's attorneys.

Over the next six months, Disney repeatedly sought an explanation for SSI's possession of the two documents. SSI insisted it did not know how or why it came to have them.

In January 2000, SSI served discovery responses, verified by Lasswell, stating that both the Patterson Memorandum and the Kaplan Note had been "produced by Disney" in discovery and that SSI had no other Disney documents that lacked a Bates stamp. By that time, Pati Slesinger had told Lasswell that SSI used an investigator to search Disney's "garbage." Also, of course, Pati Slesinger and David Bentson were well aware of Sands's activities. But Lasswell's verified discovery response on behalf of SSI made no mention of Sands as the source of the documents.

Not satisfied with SSI's explanation, Disney demanded clarification: "Put bluntly, someone associated with SSI received these [two] documents and thus knows the 'means by which' SSI came into possession of them." SSI's response, again verified by Shirley Lasswell, was: "SSI believes [each] document was produced by Disney. [Each] document appears to be written by Disney personnel. SSI does not recall further specific details responsive to this request."

### 6. *SSI's Disclosure of Sands's Employment*

Not until the March 12, 2002 deposition of Pati Slesinger did SSI acknowledge that it had employed Terry Lee Sands to take Disney documents. In that deposition, Slesinger testified that a prior SSI attorney, Marshall Morgan, had hired a detective agency, Nick Harris Detectives. Slesinger had met with one of the detectives, Terry Lee Sands, whom SSI employed "[j]ust to obtain information," including documents.

On June 10, 2002, Disney served Sands with a notice of deposition and a request that he produce copies of all documents found in his investigation for SSI. However, when Sands appeared for the deposition in September 2002, he produced no documents. He testified that when served with the subpoena on June 10, he "didn't have any documents." Later evidence revealed that SSI's then attorneys (Greenberg Glusker; see fn. 2, *ante*) were in possession of the so-called "June 7, 2002 File," consisting of 560 pages contained in a

folder labeled "Documents Received from Terry Sands on 6/7/02," a date three days before Sands was served.

During his deposition, Sands admitted that he had taken Disney documents, but testified that he had done so only from publicly accessible dumpsters. He also testified that he kept no records of the documents he had given to SSI.

After Sands's deposition, Disney immediately wrote SSI, demanding "copies of all of the documents and other materials taken from Disney's trash receptacles or other locations or surreptitiously received from any person." Through counsel, SSI responded that "the discarded papers" Sands had found "were never used in the litigation in any way. . . . [T]hey have had no impact on the proceedings at all."

### 7. SSI's Production of More Than 6,000 Pages of Disney Documents

In October 2002, pursuant to subpoenas issued by Disney, SSI began producing what turned out to be more than 6,000 pages of Disney documents taken by Sands. The documents were produced from files maintained by Pati Slesinger, Shirley Lasswell and SSI's counsel. The documents were accompanied by a multipage redaction log showing that SSI had redacted handwritten comments as being privileged on the grounds of attorney-client and work product privilege. As to those with a designated author, 48 of the redacted comments were written by Pati Slesinger and 14 by David Bentson. Also, SSI represented that it had discarded many of the Disney documents that Sands had taken, and that it had no record about which documents it discarded and when.

Among the documents SSI did produce were the following.

#### i. Two Versions of the Restricted Items List

We have already mentioned the Restricted Items List—the 278-page document maintained by Disney's in-house counsel summarizing information relating to Disney's exclusive licenses with third parties. In October 1997, when SSI first revealed to Disney that it possessed pages of the document, SSI represented that nothing on the pages it possessed suggested they were confidential.

In 2002, however, SSI produced to Disney two copies of the Restricted Items List. The first copy came from the files of SSI's attorneys. It contained the cover page as created by Disney with the declaration of confidentiality. It also contained the 24-page "Corporate Participants" section with the footer on

each page declaring: "CONFIDENTIAL—For Internal Use Only." The second copy came from files maintained by Pati Slesinger. The cover page in this copy lacked the confidentiality declaration that appeared on the Disney original. This copy also lacked the 24-page confidential Corporate Participants section.

### ii. *Two Versions of the Interrogatory Tables*

The "Interrogatory Tables" are a series of documents prepared by Disney Consumer Products relating to Winnie the Pooh products for the period 1990 to 1993. As created by Disney, each page of the tables had a footer reading: "Attorney Work Product. [¶] Privileged and confidential. Created at the request of Counsel." No copy of the tables originating from Disney lacked this footer.

SSI produced two sets of the Interrogatory Tables. One set, from counsel's files, contained the confidentiality footer. The other set, from Pati Slesinger's files, did not.

### iii. *The Fuller Memorandum*

The "Fuller Memorandum" was written by Kathy Fuller, a legal assistant for Disney, on "Office of Counsel" stationary and dated July 21, 1993. It was directed to Edward Nowak, Disney's senior in-house litigation attorney handling SSI's lawsuit. Fuller wrote the memorandum to help prepare Disney's defense in the case. The subject line reads: "Slesinger v. Disney." The following legend appears immediately above the text of the memorandum: "PRIVILEGED AND CONFIDENTIAL." In the memorandum, Fuller refers to Attorney Nowak's inquiry "regarding how 'merchandise' sales differ from videocassette sales." The memorandum analyzes the definition of "merchandise" and discusses one of the key issues in the lawsuit: whether Disney was contractually obligated to pay SSI royalties on the sale of Winnie the Pooh videocassettes.[5] Also, the Fuller Memorandum is one of the documents from which SSI redacted notations made by Pati Slesinger.

---

[5] Fuller wrote in part that she had been informed that "there really isn't a company-wide definition of the word" merchandise, but "it is the [consensus] in the industry that 'merchandise' includes non-film product. . . . [O]ur contract with Slesinger, Inc. specifically excludes film product." Fuller also wrote that "payment of third party obligations is . . . handled very differently with videocassette sales than with merchandise sales. [¶] . . . [W]hen we sell videocassettes, we pay residuals to interested third parties such as the screen writers, actors, producers and directors. The residual amounts are dictated by the interested parties' contracts with the various entertainment guilds. . . . In contrast, we pay royalties to interested third parties in connection with the sale of merchandise. The royalties paid are dictated by individual contracts between us and the interested party."

iv. *The Suit Overview Document*

The "Suit Overview Document" is an eight-page document prepared by Disney's strategic planning department in consultation with its attorneys. The document, though apparently a preliminary draft, distilled the central issues of the lawsuit and assigned a risk analysis to potential outcomes.[6]

All draft copies of the document found in Disney's files had a cover page declaring, "Privileged & Confidential—Attorney Work Product." However, the copy produced by SSI lacked that cover page.

v. *The June 7, 2002 File*

We have already mentioned the June 7, 2002 File—the file folder that was labeled "Documents Received From Terry Sands on 6/7/02," and that contained 560 pages of Disney documents, including an internal Disney News Summary dated June 5, 2002. In September 2003, SSI's then counsel (Jones Day) produced the file, which it had received from SSI's immediately preceding counsel (Greenberg Glusker). The file also contained, among other things, a July 1981 audit report addressed and delivered to Vincent Jefferds (the Disney senior vice-president who had negotiated the 1983 contract with SSI) and two complete files belonging to Disney executive Wendall Mohler. Mohler's files, which included memoranda written on "Office of Counsel" letterhead, were in pristine condition.

At the sanction hearing, SSI could provide no explanation for its counsel's possession of the contents of the file. Slesinger disclaimed any knowledge of

---

[6] For instance, the document declared that "[t]he outcome of the suit rests on the resolution of two central issues[:]—Whether or not Disney has interpreted the contract correctly with respect to Home Video[; and]—Whether or not Disney has lived up to its contractual obligation, particularly with respect to the accounting of Consumer Products revenue." The document contained a flow chart of potential outcomes. One section of the chart began with the premise, "Slesinger has no Home Video Rights," for which the chart recorded a "75%" possibility. The additional possible outcomes from this premise were: "Disney Acted Correctly (75%)," and "Disney Acted Incorrectly (25%)." From the latter flowed two additional possibilities: "Keep Contract (60%)," "Void Contract (40%)." From "Void Contract" there were yet two more possibilities: "Keep Filmed Ent. (HV, TV)," for which no percentage was listed, and "Lose Filmed Ent. (HV, TV)," for which "(0%)" was entered.

The second section of the flow chart derived from the premise, "Slesinger has Home Video rights," for which the chart listed a "25%" possibility. From this premise flowed two additional possibilities: "Keep Contract (60%)," and "Void Contract (40%)." From the latter were two more possibilities: "Keep Filmed Ent. (HV [Home Video], TV)," and "Lose Filmed Ent. (HV, TV)," for neither of which a percentage was entered.

the file. Sands did not recognize it. A representative of Greenberg Glusker did not know how the firm came to possess it.[7]

### 8. *SSI's Motion Seeking Permission to Use the Patterson Memorandum*

In the midst of disgorging Disney documents, SSI filed, in October 2002, a "Motion Re Discarded Document." In the motion, SSI requested judicial approval to use the Patterson Memorandum at trial. Although SSI had earlier characterized the "discarded" Disney documents obtained by Sands as having "no impact on the proceedings at all," SSI now characterized the Patterson Memorandum as "highly relevant" to its claim that Disney had defrauded SSI in accounting for Winnie the Pooh revenues. Further, although SSI had first represented that it did not know how it obtained the document, and had later represented (through Shirley Lasswell's verified discovery responses) that Disney had produced it during discovery, SSI now presented a different explanation: the document "was found in a Disney trash bin between 1992 and 1995."

SSI's motion was supported by declarations from Sands and David Bentson. In his declaration, Sands stated that at some point between "approximately" 1992 and 1995, he found the Patterson Memorandum in a publicly accessible dumpster at a Burbank Disney office, and delivered it to Bentson. In his declaration, Bentson explained that he recognized the Patterson Memorandum "as one of the papers Mr. Sands brought to me from the [Disney] trash" in the early to mid-1990's.

SSI's motion sought a ruling that by allegedly placing the memorandum in the trash, Disney had abandoned it and therefore waived the attorney-client privilege. SSI's motion was pending when, in February 2003, Disney moved for a terminating sanction based on SSI's "pervasive misconduct and illegal activities."

---

[7] At or about the same time that Jones Day produced the June 7, 2002 file folder, SSI proffered declarations from Pati Slesinger and Sands. Both averred that they did "not know why [any Disney] documents . . . were located" in the folder. Further, both claimed they had not delivered the documents to Greenberg Glusker or instructed anyone else to do so.

In February 2004, James Hornstein, the Greenberg Glusker attorney in whose file drawer the folder was found, was deposed. He was unable to explain his possession of the file. According to him, no one in the firm recalled Sands making a June 2002 delivery of the documents contained in the file.

At the sanction hearing, Sands testified that he did not remember delivering any documents to Greenberg Glusker in June 2002. When asked if he knew "why the file is labeled as having been containing documents" received from him, he replied: "I have no idea."

### 9. The Scope of Sands's Searches

At the sanction hearing SSI did not dispute that it employed Sands to take Disney documents. It contended, however, that Sands took documents from trash dumpsters at only one location—the Buena Vista Plaza building at 2411 West Olive in Burbank. It also contended that the dumpsters were accessible to the public, and that Sands violated no law.

In addition to the Buena Vista Plaza building, Disney conducts business at three other locations in Burbank and two in Glendale.[8] From 1990 to 1997, Disney contracted with Golden State Fibres (Golden State) to collect and destroy confidential Disney documents from its four Burbank facilities. Golden State's document destruction facility is located in Canoga Park; it is secure, surrounded by fences and walls. Golden State handled its responsibilities as follows. Golden State supplied the main studio lot with locking, three-cubic yard metal bins in which documents slated for destruction were placed. The bins were placed inside of the gated and guarded perimeter of the studio lot, an area not open or accessible to the public. Once a week, Golden State employees came to the lot, locked the bins, loaded the bins onto a flatbed truck, secured the bins with rope, and transported them to Canoga Park. At the three other Burbank Disney locations (including the Buena Vista Plaza), Golden State provided floor bins, which were placed inside the Disney offices in areas not available or accessible to the public. Golden State employees collected the documents from the containers, placed them in plastic carts, and loaded the carts into locked trucks for transport to Canoga Park. Generally, Golden State destroyed documents the day of receipt. If not, the locked bins taken from the main studio lot were locked inside of Golden State's plant and the carts containing the documents from the other Disney facilities remained in the trucks (secured by padlocks) parked inside of the Golden State facility.

Sands began his activities by obtaining an internal Disney directory to help locate the offices of various individuals. In testimony specifically disbelieved by the trial court, Sands claimed to have consulted the police, who told him that "there was no law prohibiting [his] going into a dumpster located next to a public alleyway." He also claimed, again in testimony specifically disbelieved by the trial court, to have ultimately obtained documents only from publicly accessible dumpsters at the Buena Vista Plaza building, and never to have obtained documents from the Golden State facility in Canoga Park.

---

[8] The other three Burbank locations are the main Disney Studio lot at 500 South Buena Vista; the Disney Channel building at 3800 West Alameda; and the Tower building at 3900 West Alameda. In Glendale, Disney does business at Walt Disney Imagineering, located at 1401 Flower Street, and at the Disney Store, located at 101 North Brand Boulevard.

At some point in 1994 or 1995, Pati Slesinger and David Bentson visited the Buena Vista Plaza site by stopping their car nearby and looking at it. They wanted to confirm that it was, according to Slesinger's testimony at the sanction hearing, "open and public, and I guess . . . legal, too." Slesinger found the site to be "on a publicly accessible road," and hence she determined that Sands's seizure of documents from the site "seemed, yes," legal.

Despite Sands's testimony that he searched only publicly accessible dumpsters at the Buena Vista Plaza building in Burbank, there was considerable evidence (credited by the trial court) that his searches were much broader, and included Golden State's secure facility in Canoga Park. Earlier statements by Sands himself contradicted the notion that he limited his searches to one location, and suggested two or more locations.[9] Moreover, although Sands denied taking documents from Golden State, he testified that he knew Golden State destroyed Disney's documents, and that he followed Golden State's trucks from at least one Disney building to that location.[10]

In the first of his two anonymous telephone calls to Disney security in 1994, Richard Holman, Sr., reported that he and Sands took documents from "locations in Northridge, Burbank, Glendale and trash cans on Flower Street" and on one occasion "were able to get [past] the security guard at the Olive Building[,] enter some of the offices and take documents (i.e., contracts) off the desks."[11] Holman, Sr.'s son, Richard Dale Holman, Jr., provided a

---

[9] In a September 2002 deposition, Sands was asked how he chose which documents to take from a dumpster. He responded: "It depended on how much time, you know, I had *at any given location,*" a response implying that more than one location was involved. (Italics added.) At another point in the deposition, Sands explained that he had searched through dumpsters at two locations, one in Canoga Park (the city in which Golden State was located) and the other in the 100 or 200 block of Brand Boulevard in Glendale (the Disney Store is located at 101 North Brand Boulevard). Further, in a declaration executed in October 2002, Sands admitted "visit[ing] dumpsters at two other locations" although he claimed he had found no documents there related to Winnie the Pooh.

[10] This admission was consistent with a declaration from Golden State's owner and president that was submitted at the sanction hearing. According to that declaration, in the mid-1990's one of Golden State's drivers reported that an unidentified man, who consistently followed him on his route from Disney to the Canoga Park facility, once offered him money for a bin of paper collected from Disney.

[11] Holman, Sr., was unavailable to testify at the sanction hearing, but his videotaped deposition from November 2002 was introduced. In that testimony, he admitted that he had made the two anonymous calls, but he contradicted the claim made in the first call that he and Sands searched multiple locations. He testified that with the exception of having searched one dumpster with Sands, his accusations in the two anonymous calls were false. He said that he had made the calls because he had argued with Sands, but he could not recall the reason for the argument.

In a credibility finding unchallenged by SSI on appeal, the trial court found that Holman, Sr.'s description of his and Sands's activities in the first anonymous call was truthful, and that Holman, Sr.'s later recantation was not. Moreover, during his deposition, Holman, Sr., was

declaration from which it could be inferred that Sands took documents from Golden State and another facility. In the declaration, Holman, Jr., stated that he "went on a few trash searches" with Sands. Born in August 1980, Holman, Jr., would have been 12 to 15 years old in the period 1992 to 1995. According to Holman, Jr., "[t]wo searches occurred at the 'waste management' facility in the San Fernando Valley. A third search occurred farther west in the San Fernando Valley. Likely Reseda or Canoga Park. At this location, Terry and I went onto the property through a hole in the fence at the back of the property. Terry said I went along as an alibi in case a security guard came. During all three searches, I held a duffel bag while it was [filled] with legal documents. During all three searches, we removed approximately 7 or 8 inches tall of documents."[12]

Golden State's Canoga Park facility was secure, surrounded by fences and walls. Thus, Holman, Jr.'s claim to have entered a Canoga Park or Reseda facility with Sands through a hole in the fence, and to have held a duffel bag while Sands filled it with documents, suggested that Sands illegally entered Golden State's facility, and stole, from either locked trucks or the locked plant, Disney documents that were intended for destruction.[13]

Finally, the nature of some of the documents Sands passed on to SSI suggested that he could not have obtained them from the Buena Vista Plaza building. Neither the author of the Patterson Memorandum (Thomas Patterson), nor its intended recipient (Carrie Stone), ever worked at Buena Vista Plaza. The Restricted Items List was kept by Disney's in-house counsel, whose office was in The Tower building located on West Alameda in Burbank. Kathy Fuller, author of the Fuller Memorandum, and the intended recipient (Disney Attorney Edward Nowak) worked at the Team Disney building, located on the Disney Studio lot at 500 South Buena Vista.

unable to recognize photographs of the Buena Vista Plaza facility—the sole Disney facility from which Sands claimed to have obtained documents. Further, Holman, Sr., drew a diagram of the Burbank location which, according to his testimony, he and Sands had searched. As the trial court noted in its findings, the diagram did *not* resemble Buena Vista Plaza; instead, it resembled other Disney locations in Burbank. Further, Holman, Sr., testified at the deposition that he drove with Sands to a location in Canoga Park (the city in which Golden State was located), and waited in the car while Sands checked to see if the facility was accessible.

[12] At the time of the sanction hearing, Holman, Jr., was unavailable to testify because he was in prison. SSI made multiple objections to Disney's use of Holman, Jr.'s declaration, all of which the trial court overruled. SSI has not renewed any of those objections on this appeal. We therefore deem them abandoned. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [188 Cal.Rptr. 115, 655 P.2d 317].)

[13] In his sanction hearing testimony, Sands conceded that Holman, Jr., sometimes accompanied him on searches in the western San Fernando Valley. According to Sands, on some occasions, Holman, Jr., would wait in the car and flash the lights and sound the horn if anyone approached. But Sands testified that the "work [he did with Holman, Jr.,] had nothing to do with Disney and did not involve . . . the Golden State Fibers facility in Canoga [*sic*]."

Similarly, Disney's strategic planning department, which prepared the Suit Overview Document, was located in the Team Disney building. Finally, the June 7, 2002 File contained an audit report sent to Vincent Jefferds (the Disney senior vice-president who negotiated the 1983 contract with SSI), and two complete files in pristine form belonging to another Disney executive, Wendall Mohler. Neither Jefferds nor Mohler ever worked at Buena Vista Plaza.

No evidence suggested how these various documents could have ended up in the trash at the Buena Vista Plaza building. There was, however, evidence suggesting how the documents, nonetheless, ended up in SSI's possession. Either Sands entered one or more of Disney's Burbank facilities and took the documents from the bins provided by Golden State for disposal of confidential documents or Sands trespassed onto Golden State's facility in Canoga Park and took the documents before Golden State had a chance to destroy them.

### 10. *SSI's Alteration of Disney Documents*

Disney presented circumstantial evidence that Pati Slesinger or someone else on SSI's behalf altered copies of the Restricted Items List and the Interrogatory Tables after receiving them from Sands to delete any reference to their confidentiality.

At the sanction hearing, Erich Speckin, a forensic document specialist, testified that he had examined the two copies of the Restricted Items List and of the Interrogatory Tables produced by SSI in 2002. As we have already noted, the copy of Restricted Items List from the files of SSI's attorneys contained the cover page with the declaration of confidentiality as created by Disney, and the 24-page Corporate Participants section with the footer on each page declaring: "CONFIDENTIAL—For Internal Use Only." The copy from Pati Slesinger's files, however, contained a cover page that lacked the confidentiality declaration. Also, Slesinger's copy did not contain the 24-page confidential Corporate Participants section.

Similarly, the copy of the Interrogatory Tables from the files of SSI's attorneys contained the footer created by Disney on each page declaring: "Attorney Work Product. [¶] Privileged and confidential. Created at the request of Counsel." But the copy from Slesinger's files lacked the footer.

According to Speckin, Slesinger's copies of the documents were made from the sets possessed by SSI's counsel. In other words, Slesinger or someone else had: (1) altered the cover page of the Restricted Items List to delete its confidentiality declaration in Slesinger's copy; (2) omitted the

24-page confidential Corporate Participants section from Slesinger's copy; and (3) altered each page of the Interrogatory Tables to delete its confidentiality footer in Slesinger's copy.

Pati Slesinger denied having altered the documents or having directed anyone else to do so.

### 11. *The Fax Legends*

Copies of several documents produced by SSI contained facsimile (fax) legends tracing them to Slesinger and Lasswell's offices, as well as the offices of SSI's counsel. Among these documents was a copy of the Fuller Memorandum, which contained a fax header indicating that in September 1993 it was sent to SSI's attorneys from Slesinger's office.

Similarly, a copy of a page from the Interrogatory Tables contained a legend showing the fax numbers of Pati Slesinger's office in Beverly Hills and Shirley Lasswell's office in Florida. The legend indicated that in September 1993, the page was faxed from Slesinger's office to Lasswell's office. The page contained the footer stating the page to be confidential. A copy of the Kaplan Note produced by SSI also bore two fax legends, one indicating it had been sent from Slesinger's office and another indicating receipt by SSI's counsel.

### 12. *The Trial Court's Ruling on Disney's Sanction Motion*

SSI's opposition to Disney's sanction motion raised three primary arguments: first, that Sands had taken documents only from publicly accessible dumpsters at the Buena Vista Plaza; second, that Disney had created both confidential and nonconfidential sets of the Restricted Items List and Interrogatory Tables, and SSI had not altered the copies in its possession; and third, that none of the documents taken by Sands was useful to SSI.

The trial court issued a comprehensive statement of decision. The court found that Sands had taken documents from multiple Disney locales and the Golden State facility (committing civil trespass in the process), and that SSI had either explicitly or implicitly authorized his activities. Expressly finding Pati Slesinger not credible, the court found that she (or someone else on SSI's behalf) had altered documents to make it appear they were not confidential. With respect to Shirley Lasswell, the court noted that although in her 1997 deposition testimony she denied knowing of Sands's activity, there were fax transmission headers to and from Lasswell's Florida office on some of the confidential Disney documents taken by Sands. The court found that Sands's and SSI's failure to keep records of the documents obtained by Sands and of

those discarded by SSI was not "accidental," because SSI did not want the scope of Sands's activities disclosed. Further, the court reasoned that SSI could give no satisfactory assurance that it had produced all the illicitly obtained documents it possessed, leading the court to conclude that SSI likely possessed additional such documents.

Concerning the Disney documents SSI did produce, the court found them to "reveal, among other things, privileged information useful to . . . SSI." The court considered, but rejected, lesser sanctions, including an order that SSI return all Disney documents, and an order for monetary sanctions. The court reasoned that "SSI's principals who read Disney's writings possess in their minds information which no Court order or sanction can purge. The Court does not believe SSI will comply fully with any future remedial order if SSI concludes, as it apparently has in the past, that compliance with a court order does not serve its private tactical objectives." The court concluded: "[SSI] has tampered with the administration of justice and threatened the integrity of the judicial process. SSI's misconduct is so egregious that no remedy short of terminating sanctions can effectively remove the threat and adequately protect both the institution of justice and [Disney] from further SSI abuse. Exercising its inherent powers to preserve and protect the integrity of the judicial process, the Court dismisses SSI's action with prejudice as a terminating sanction."[14]

### 13. *SSI's Motion for a New Trial*

SSI moved for a new trial, limited to the issue of the appropriate remedy for SSI's misconduct. For the first time, SSI proposed an alternative to a terminating sanction, consisting of a change in trial counsel, employment of "Document Review Counsel" to isolate tainted documents from new trial counsel, and a series of prophylactic court orders.[15] The proposal was

---

[14] A secondary issue raised by Disney's sanctions motion was whether SSI had withheld information in violation of court-ordered discovery. The trial court found that SSI's repeated failures to comply with discovery "appear[] more than inadvertent." The court also found that "[i]f SSI's failure to timely produce, and active withholding of, relevant SSI information and documents were the only issues here, a remedy short of terminating sanctions might be appropriate. But SSI's other misconduct . . . compels the Court to consider and ultimately order terminating sanctions."

[15] Under the proposal, SSI's then current counsel (the Hancock, Rothert and Cochran, Cherry firms) would withdraw as trial counsel because they had reviewed the illicitly obtained documents. SSI would retain new trial counsel.

Rothman, Hancock and the firm of Novian & Novian would function as Document Review Counsel (DRC). DRC would inoculate new trial counsel against the improperly obtained documents by: (1) reviewing all files in possession of trial counsel and removing all documents that were not Bates stamped or exhibits; (2) removing from the files any document that could not be attributed to a source other than SSI's improper acquisition of Disney material; (3) reviewing memoranda, summaries and correspondence (including privileged matter) being

supported by declarations from SSI's attorneys who had reviewed the Disney documents taken by Sands. Each concluded that the documents "would add nothing to [SSI's] case." Further, SSI argued that its proposal did "not rely on promises or assurances by [SSI] or by its principals." SSI presented no declarations from Slesinger, Lasswell, or Bentson concerning their use or retention of stolen documents.

The trial court denied SSI's motion for a new trial. It explained that SSI's proposed remedy could not purge the illicitly obtained information from the minds of SSI's principals, and could not ensure that they would not use the information in shaping SSI's litigation strategy.

## DISCUSSION

### A. Inherent Power to Dismiss

SSI's presents a multifaceted challenge to the trial court's reliance on its inherent power to dismiss SSI's lawsuit. According to SSI, California trial courts have no inherent power to dismiss a case as a sanction for misconduct. Relying primarily on *Lyons v. Wickhorst* (1986) 42 Cal.3d 911, 915 [231 Cal.Rptr. 738, 727 P.2d 1019] (*Lyons*), and *Bauguess v. Paine* (1978) 22 Cal.3d 626, 634–639 [150 Cal.Rptr. 461, 586 P.2d 942] (*Bauguess*), SSI asserts that a trial court's inherent power to terminate litigation is confined to cases in which the plaintiff has unreasonably delayed in prosecuting the action, or in which the plaintiff's claim is a sham or fictitious. Further, SSI argues that the existence of an inherent power to dismiss is inconsistent with the state constitutional right to a jury trial. Finally, SSI suggests that even if the inherent power to terminate an action for misconduct exists, the power can be exercised only when the party to be sanctioned has violated a court order.

None of SSI's contentions is well taken. SSI misconstrues *Lyons* and *Bauguess*, and misconceives the nature and scope of inherent judicial power.

provided to new trial counsel to ensure that any quotations from, or summaries of, the "Isolated Documents" were redacted; and (4) filing a declaration with the court describing all of its actions.

Next, the court would order: (1) that SSI, its agents, and all prior counsel "not . . . disclose copies of any . . . document, or any information taken therefrom, which information is not lawfully obtainable from another [proper] source"; (2) that new trial counsel "not knowingly review or make any use of any [illicitly obtained] document or information taken therefrom"; and (3) that "[s]hould new counsel discover any [wrongfully acquired] document in the files provided to it, such document shall promptly be delivered . . . to the DRC which shall give the documents the same treatment as the other Isolated Documents." Finally, new trial counsel would be required to sign a document acknowledging its agreement to be bound by this entire procedure.

■ The doctrine of inherent judicial power—that is, the existence of power vested in courts by their creation, and independent of legislative grant—developed early in English common law "along two paths, namely, . . . punishment for contempt of court and of its process, and . . . regulating the practice of the court and preventing the abuse of its process." (Jacob, *The Inherent Jurisdiction of the Court* (1970) 23 Current Legal Problems 23, 25.) American courts embraced the doctrine as part of their common law heritage. As early expressed by the United States Supreme Court, courts possess powers that "necessarily result . . . from the nature of their institution," powers that "cannot be dispensed with . . . , because they are necessary to the exercise of all others." (*United States v. Hudson* (1812) 11 U.S. 32, 34 [3 L.Ed. 259]; see Meador, *Inherent Judicial Authority in the Conduct of Civil Litigation* (1995) 73 Tex. L.Rev. 1805, 1806, 1815–1816 (Meador).)

■ From their creation by article VI, section 1 of the California Constitution, California courts received broad inherent power "not confined by or dependent on statute." (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 267 [279 Cal.Rptr. 576, 807 P.2d 418]; see also Civ. Code § 22.2;[16] *Ferguson v. Keays* (1971) 4 Cal.3d 649, 654–655 [94 Cal.Rptr. 398, 484 P.2d 70] (*Ferguson*) [California courts possess inherent powers enjoyed by English common law courts, except for those precluded by Civ. Code, § 22.2].) This inherent power includes "fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [67 Cal.Rptr.2d 16, 941 P.2d 1203].) Although it has been held that California courts have inherent authority to impose *evidentiary sanctions* as a remedy for litigation misconduct (see *Peat, Marwick, Mitchell & Co. v. Superior Court* (1988) 200 Cal.App.3d 272, 286–291 [245 Cal.Rptr. 873] (*Peat*)), no California decision has held that a court may, when faced with pervasive litigation abuse, use its inherent judicial power to *dismiss the action*. We have no doubt, however, that California courts possess such power.

Past California decisions have affirmed dismissals as an exercise of inherent power in two situations. First, because delay in prosecution interferes with the orderly process of litigation and may make a fair trial unlikely, California courts have inherent power to dismiss civil cases for unreasonable, inexcusable delay in prosecution. (*People v. Jefferds* (1899) 126 Cal. 296, 300–301 [58 P. 704]; *Karras v. Western Title Ins. Co.* (1969) 270 Cal.App.2d 753, 757 [76 Cal.Rptr. 141].) Second, because courts should hear only actual disputes, and should prevent harassment of defendants, California courts

---

[16] Civil Code section 22.2 provides: "The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all the courts of this State."

possess the inherent authority to dismiss cases that are fraudulent or "vexatious." (*Estate of King* (1953) 121 Cal.App.2d 765, 774–775 [264 P.2d 586]; *Cunha v. Anglo California Nat. Bank* (1939) 34 Cal.App.2d 383, 388–390 [93 P.2d 572].)

In *Lyons, supra,* 42 Cal.3d 911, the Supreme Court observed that "in the past" the inherent power to terminate litigation has "been confined to [these] two types of situations." (*Id.* at p. 915.) But this observation—made as dicta—is not an exhaustive listing of the circumstances in which dismissal as an exercise of inherent power is authorized. To the contrary, *Lyons* implicitly *acknowledged* that a court has inherent power to dismiss an action for misconduct that violates established procedures or a court order. *Lyons* held simply that the misconduct involved in that case—the plaintiff's refusal to participate in mandatory judicial arbitration—was not an adequate ground to exercise that power. A close examination of *Lyons* demonstrates the point.

In *Lyons,* the trial court ordered the parties to participate in mandatory judicial arbitration pursuant to the then current version of Code of Civil Procedure section 1141.11. (*Lyons, supra,* 42 Cal.3d at p. 914.) The plaintiff refused, resulting in a defense award. The plaintiff requested a trial de novo, but on defense motion, the trial court dismissed the action as a sanction for the plaintiff's refusal to participate in the judicial arbitration. (*Id.* at p. 914.) On appeal (as here relevant), the majority opinion analyzed the dismissal in part as an exercise of inherent judicial power. Besides noting that past exercise of the inherent power to dismiss had been confined to cases involving failure to prosecute and fictitious or sham claims, the majority looked also to lower federal court decisions construing the power to dismiss under rule 41(b) of the Federal Rules of Civil Procedure (28 U.S.C.) for a violation of the Federal Rules of Civil Procedure or failure to comply with a court order. The majority recognized that federal courts have inherent power to "dismiss an action sua sponte for the same reasons." (42 Cal.3d at p. 916.)

The *Lyons* majority summarized federal case law as follows: "As demonstrated by the federal cases construing rule 41(b), there are two important inquiries to be made by trial courts when determining whether a plaintiff's actions warrant a dismissal with prejudice. First, the court must discern whether the plaintiff's pattern of conduct was so 'severe [and] deliberate' as to constitute extreme circumstances. [Citation.] Second, the court must look to see whether alternatives less severe than dismissal are available. The ' "sound exercise of discretion requires the judge to consider and use lesser sanctions" ' unless the court's authority cannot possibly be otherwise vindicated. [Citation.]" (*Lyons, supra,* 42 Cal.3d at p. 917.)

The majority used this analysis to "examine the circumstances under which [the plaintiff's] motion for a trial de novo was dismissed." (*Lyons, supra,* 42

Cal.3d at p. 917.) The majority held that dismissal as a sanction for refusing to participate in mandatory judicial arbitration was "too drastic a remedy in light of the fact that arbitration was not intended to supplant traditional trial proceedings, but to expedite the resolution of small civil claims." (*Id.* at p. 919.)

A three-justice minority agreed with the majority's conclusion "that dismissal here was too drastic a penalty for appellant's refusal to present evidence at the arbitration proceedings." (*Lyons, supra*, 42 Cal.3d at p. 926 (conc. opn. of Reynoso, J.).) But the minority would have left "open the question whether, in a particularly egregious case, a trial court would have inherent power to dismiss the action." (*Id.* at p. 927 (conc. opn. of Reynoso, J.).)[17]

Nothing in the *Lyons* majority precludes the use of inherent power to terminate litigation as a remedy for litigation misconduct *other than* refusal to participate in mandatory judicial arbitration. To the contrary, the *Lyons* majority acknowledges the existence of inherent power to dismiss an action for misconduct violating established procedures or a court order, but limits its exercise to "extreme circumstances" of deliberate misconduct when no lesser sanction would be effective to cure the harm. (See 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 252, pp. 670–671 [citing *Lyons, supra*, 42 Cal.3d at p. 917, and observing that the trial court's inherent power to dismiss is limited to "extreme circumstances" where "the court's authority 'cannot possibly be otherwise vindicated' "].)

SSI also argues that *Bauguess, supra*, 22 Cal.3d 626, militates against finding an inherent power to dismiss for litigation misconduct. In *Bauguess*, the Supreme Court held that trial courts have no authority to award attorney fees as a sanction for misconduct unless granted by statute or specified by contract. (*Id.* at pp. 634–638.) The court recognized the existence of inherent judicial power to supervise judicial proceedings, but reasoned that inherent power to award attorney fees as a sanction was unnecessary, because courts

---

[17] In a separate opinion concurring in her own majority opinion, Chief Justice Bird observed that "[i]n order to secure a majority" she had omitted "any discussion of the implications of the trial court's actions on the constitutional jury trial guarantee." (*Lyons, supra*, 42 Cal.3d at pp. 919–920 (conc. opn. of Bird, C. J.).) Expressing the views of herself alone, she would have held "that the use of involuntary dismissals as a sanction to ensure full participation in judicially mandated arbitration proceedings creates an unconstitutional burden on a litigant's right to a jury trial." (*Id.* at p. 926 (conc. opn. of Bird, C. J.).) In a separate concurring opinion, Justice Grodin expressed the view that "the Legislature may constitutionally authorize a trial court to dismiss an action if a plaintiff intentionally refuses to participate in a legislatively established, mandatory judicial arbitration process." (*Id.* at p. 927 (conc. opn. of Grodin, J.).) He joined in the majority only "because . . . the Legislature has to date declined to authorize . . . the dismissal of the plaintiff's action as a sanction for such conduct." (*Ibid.*)

have "ample power to punish the misconduct as contempt." (*Id.* at p. 638.) Moreover, the court concluded that approving such power was unwise, because it "may imperil the independence of the bar and thereby undermine the adversary system" (*ibid.*); and because it would be "a power without procedural limits and potentially subject to abuse" (*ibid.*).

The rationale of *Bauguess* does not apply here. Far from being unnecessary, the existence of inherent power to terminate litigation for deliberate and egregious misconduct—conduct that makes lesser sanctions inadequate to ensure a fair trial—is essential for the court to preserve the integrity of its proceedings. Such power does not "imperil the independence of the bar" and "undermine the adversary system." (*Bauguess, supra*, 22 Cal.3d at p. 638.) Rather, it restores balance to the adversary system when the misconduct of one party has destroyed it. And, as illustrated by the instant case, such power can be exercised with full procedural due process: the trial court held a noticed evidentiary hearing, and SSI makes no claim that the procedure violated its due process rights. *Bauguess* is simply inapposite.

The recognition that California courts have inherent power to terminate litigation for deliberate and egregious misconduct when no other remedy can restore fairness is consistent with the overwhelming weight of authority from federal courts and courts of other states. (See Meador, *supra*, 73 Tex. L.Rev. at p. 1815 [terminating sanctions are "generally acknowledged to be within a court's inherent power," to be imposed only when lesser sanctions are inadequate].)[18] Although nuances of analysis exist among these decisions, the

---

[18] For sample federal decisions, see, e.g., *Shepherd v. American Broadcasting Companies, Inc.* (D.C.Cir. 1995) 314 U.S. App.D.C. 137 [62 F.3d 1469, 1472] (acknowledging inherent power to enter default judgment against defendant for litigation misconduct where lesser sanction is insufficient to punish misconduct and permit a fair trial); *Aoude v. Mobil Oil Corp.* (1st Cir. 1989) 892 F.2d 1115, 1118–1122 (*Aoude*) (affirming dismissal of complaint as proper sanction for plaintiff's manufacture of false evidence and other misconduct constituting a "fraud on the court"); *Woodson v. Surgitek, Inc.* (5th Cir. 1995) 57 F.3d 1406, 1417–1418 (affirming dismissal of plaintiff's complaint for bad faith delay and other wide-ranging misconduct by plaintiff's attorney throughout the litigation); *Martin v. DaimlerChrysler Corp.* (8th Cir. 2001) 251 F.3d 691, 694–695 (affirming dismissal for plaintiff's perjury in discovery responses); *Anheuser-Busch v. Natural Beverage Distributors* (9th Cir. 1995) 69 F.3d 337, 352–355 (*Anheuser-Busch*) (affirming dismissal of counterclaim based on litigation and discovery misconduct prejudicing opponent's right to a fair trial).

For sample state court decisions, see, e.g., *Schultz v. Sykes* (2001) 2001 WI App 255 [248 Wis. 2d 746, 638 N.W.2d 604, 610] (affirming dismissal based on plaintiff's attempt to suborn perjury); *Cox v. Burke* (Fla.Dist.Ct.App. 1998) 706 So.2d 43, 46–47 (*Cox*) (affirming dismissal based on plaintiff's perjurious discovery responses); *Rockdale Management Co. v. Shawmut Bank, N.A.* (1994) 418 Mass. 596 [638 N.E.2d 29, 31–32] (affirming dismissal based on plaintiff's forgery of evidence and false discovery responses); *Cummings v. Wayne Co* (1995) 210 Mich.App. 249 [533 N.W.2d 13, 13–15] (affirming dismissal based on plaintiff's tampering with defense witnesses by acts of vandalism and death threats); *Young v. Johnny Ribiero Building* (1990) 106 Nev. 88 [787 P.2d 777, 778–782] (affirming dismissal for willful

general theory supporting them is straightforward: "Courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system." (*Aoude, supra*, 892 F.2d at p. 1119.)

■ California courts, too, retain flexibility to exercise historic inherent authority in modern circumstances, fashioning procedures and remedies as necessary to protect litigants' rights. (See *Board of Supervisors v. Superior Court* (1994) 23 Cal.App.4th 830, 848 [28 Cal.Rptr.2d 560]; *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1377–1378 [5 Cal.Rptr.2d 882].) When a plaintiff's deliberate and egregious misconduct in the course of the litigation renders any sanction short of dismissal inadequate to protect the fairness of the trial, California courts necessarily have the power to preserve their integrity by dismissing the action. Without such power, the court would sacrifice its essential role of determining, in accordance with the fair application of relevant law, who should prevail in the case or controversy presented. (See *Schultz, supra*, 638 N.W.2d at p. 612.)

■ There are, of course, limits on the inherent authority of California courts—inherent power may only be exercised to the extent not inconsistent with the federal or state Constitutions, or California statutory law. (*Ferguson, supra*, 4 Cal.3d at pp. 654–655; *Martin v. Superior Court* (1917) 176 Cal. 289, 293–295 [168 P. 135]; see Civ. Code, § 22.2.) SSI makes no claim that dismissal of the instant action violated federal constitutional principles (with good reason, given the state of federal case law). (See also *Gonzalez v. Trinity Marine Group, Inc.* (5th Cir. 1997) 117 F.3d 894, 898–899 [dismissal of action for fabrication of evidence following evidentiary hearing does not violate right to a jury trial].)

■ The only state constitutional impediment asserted by SSI is the right to a jury trial under article I, section 16 of the California Constitution. SSI argues that without statutory authorization, litigation misconduct cannot constitute a "waiver" of the right to a jury trial. (See *Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944, 967 [32 Cal.Rptr.3d 5, 116 P.3d 479] [invalidating predispute contractual jury waivers on the ground that waiver of a jury trial in civil cases is permitted only as authorized by statute].) But the exercise of the inherent power to dismiss for deliberate and egregious misconduct does not rely on the fiction of an implied jury trial waiver. It relies, rather, on the power the court derives from its nature as an institution

fabrication of evidence in discovery); *Klupt v. Krongard* (1999) 126 Md.App. 179 [728 A.2d 727, 735–738] (*Klupt*) (recognizing inherent power of court to sanction for destruction of evidence, and upholding dismissal as proper exercise of power vested in court inherently and by court rule).

of justice, and on the acknowledgement that the right to a jury trial presupposes a fair trial, and that requiring a jury trial when fairness cannot be assured would be unjust.

■ Further, the exercise of the inherent power to dismiss, like all inherent authority, derives in part from the court's historic powers in equity. (See *Peat, supra,* 200 Cal.App.3d at p. 287; *Cummings v. Wayne Co, supra,* 533 N.W.2d at p. 14; *Aoude, supra,* 892 F.2d at p. 1119.) Equitable defenses are tried to the judge alone; the judge's findings may well obviate a jury trial on remaining legal issues, without abridging the right to a jury trial. (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1238 [19 Cal.Rptr.3d 416].) When a court grants a motion seeking dismissal on the basis of the opposing party's misconduct, the court does not violate the right to a jury trial, any more than when the court upholds other defenses in equity that defeat the plaintiff's lawsuit. (See *Schultz, supra,* 638 N.W.2d at p. 615 [holding evidentiary hearing, making credibility findings, and assessing need for sanctions does not violate right to a jury trial under Wisconsin Constitution].)

■ Just as no constitutional impediment to the existence of inherent power to dismiss for pervasive misconduct exists, no legislative impediment exists, either. The Legislature recognizes that courts possess inherent power to dismiss actions—thus depriving the offending party of a jury trial—in circumstances not covered by statute. Code of Civil Procedure section 581, the general dismissal statute, lists several grounds for involuntary dismissal. It also provides: "The provisions of this section shall not be deemed to be an exclusive enumeration of the court's power to dismiss an action or dismiss a complaint as to a defendant." (§ 581, subd. (m).) Similarly, chapter 1.5 of the Code of Civil Procedure, beginning with section 583.110, governs dismissal for delay in prosecution. Section 583.150 of that chapter states: "This chapter does not limit or affect the authority of a court to dismiss an action or impose other sanctions under a rule adopted by the court pursuant to Section 575.1 or by the Judicial Council pursuant to statute, *or otherwise under inherent authority of the court."* (Italics added.) Similarly, the power to impose sanctions under the Civil Discovery Act (§ 2016.010 et seq.) supplements, but does not supplant, a court's inherent power to deal with litigation abuse. (*Peat, supra,* 200 Cal.App.3d at pp. 285–286.)

■ Finally, contrary to SSI's contention, a court's exercise of inherent power to dismiss for misconduct need not be preceded by violation of a court order. The essential requirement is to calibrate the sanction to the wrong. Whether the misconduct violates a court order is relevant to the exercise of inherent power, but it does not define the boundary of the power. (See, e.g., *Cummings v. Wayne Co, supra,* 533 N.W.2d at p. 14 [witness tampering]; *Aoude, supra,* 892 F.2d at pp. 1118–1119 [fabrication of evidence and other

acts constituting a "fraud on the court"].) The decision whether to exercise the inherent power to dismiss requires consideration of all relevant circumstances, including the nature of the misconduct (which must be deliberate and egregious, but may or may not violate a prior court order), the strong preference for adjudicating claims on the merits, the integrity of the court as an institution of justice, the effect of the misconduct on a fair resolution of the case, and the availability of other sanctions to cure the harm.[19] (See, e.g., *Aoude, supra*, 892 F.2d 1115; *Anheuser-Busch, supra*, 69 F.3d at pp. 348–349.) We do not attempt to catalogue all the factors that must be considered in any particular case, except to emphasize that dismissal is *always* a drastic remedy to be employed *only* in the rarest of circumstances. We also do not attempt to catalogue the types of misconduct necessary to justify an exercise of the inherent power to dismiss, because "corrupt intent knows no stylistic boundaries." (*Aoude, supra*, 892 F.2d at p. 1118.) ▮ Rather, we hold only that when the plaintiff has engaged in misconduct during the course of the litigation that is deliberate, that is egregious, and that renders any remedy short of dismissal inadequate to preserve the fairness of the trial, the trial court has the inherent power to dismiss the action.[20] Such an exercise of inherent authority is essential for every California court to remain " 'a place

---

[19] In considering the availability of other sanctions, a trial court must be mindful that under *Bauguess*, its inherent authority to sanction for egregious misconduct does not include the power to award attorney fees to punish that misconduct. As we have discussed, *Bauguess* held that an award of attorney fees must be authorized by statute or contract. (*Bauguess, supra*, 22 Cal.3d at p. 638; *Andrews v. Superior Court* (2000) 82 Cal.App.4th 779 [98 Cal.Rptr.2d 426]; *Trans-Action Commercial Investors, Ltd. v. Firmaterr, Inc.* (1997) 60 Cal.App.4th 352 [70 Cal.Rptr.2d 449].) Hence, absent an applicable statutory provision (e.g., Code Civ. Proc., §§ 2023.010–2023.040) or a contractual attorney fee provision, the trial court cannot impose monetary sanctions.

[20] Other state and federal courts have used a variety of characterizations to describe the misconduct necessary to invoke the inherent power to dismiss, including: "fraud on the court," meaning deliberate conduct that "set[s] in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense" (*Aoude, supra*, 892 F.2d at p. 1118; see also *Rockdale Management Co. v. Shawmut Bank, N.A., supra*, 638 N.E.2d at p. 31; *Cox, supra*, 706 So.2d at p. 46); conduct "due to ' "willfulness, fault, or bad faith," ' " and having a relationship to "the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the case' " (*Anheuser-Busch, supra*, 69 F.3d at p. 348); "deliberately . . . deceptive practices that undermine the integrity of judicial proceedings," including " 'when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice' " (*ibid.*); " 'egregious misconduct such as "willful or contemptuous" behavior, "a deliberate attempt to hinder or prevent effective presentation of defenses or counterclaims," or "stalling in revealing one's own weak claim or defense" ' " (*Klupt, supra*, 728 A.2d at p. 738).

Such characterizations may be helpful. But we prefer simply to describe the requisite misconduct as deliberate and egregious such that no sanction other than dismissal is adequate to ensure a fair trial. We trust to the experience of trial courts to identify which litigation misconduct falls within this standard.

where justice is judicially administered.' " (*Von Schmidt v. Widber* (1893) 99 Cal. 511, 512 [34 P. 109], quoting 3 Blackstone, Commentaries 23.)

## B. The Trial Court's Imposition of a Terminating Sanction Was Not an Abuse of Discretion

Having concluded that California trial courts possess the inherent power to issue a terminating sanction for pervasive misconduct, we now consider whether, in the present case, the trial court properly exercised that power. Our review is for abuse of discretion. (*R.S. Creative, Inc. v. Creative Cotton, Ltd.* (1999) 75 Cal.App.4th 486, 496 [89 Cal.Rptr.2d 353].) We view the entire record in the light most favorable to the court's ruling, and draw all reasonable inferences in support of it. (See *Laguna, supra*, 231 Cal.App.3d at p. 491.) We also defer to the trial court's credibility determinations. (*Hurtado v. Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1024 [213 Cal.Rptr. 712].) The trial court's decision will be reversed only "for manifest abuse exceeding the bounds of reason." (*Kuhns v. State of California* (1992) 8 Cal.App.4th 982, 988 [10 Cal.Rptr.2d 773].)

SSI levels several attacks on the trial court's ruling. None is persuasive, and we dispose of each in turn.[21]

### 1. *The Timeliness of Disney's Motion*

In the trial court, SSI argued that Disney's motion for a terminating sanction was untimely. On appeal, in its summary of the evidence, SSI implicitly resurrects the argument under the heading "Disney Waited Over Eight Years to Complain About the Trash Searches." SSI asserts that Richard Holman, Sr.'s two anonymous telephone calls to Disney security in June 1994 put "Disney's legal team" on notice as to "the same trash searches and alleged break-in" that were the subject of the sanction motion in February 2003, "[y]et Disney did not pursue this matter with the court or even complain to [SSI] about it for eight years."

We treat SSI's assertion as a contention requiring discussion. In granting Disney's motion, the trial court implicitly rejected SSI's contention that

---

[21] SSI concedes that we review the trial court's decision under the abuse of discretion standard. But in its summary of the record and its arguments, SSI observes this standard more by the breach than the adherence. SSI accords little, if any, deference to the trial court's detailed findings (though SSI professes to defer to them), and sometimes ignores them altogether. On key points, SSI focuses only on the evidence that supports its arguments, including evidence discredited by the trial court. SSI's approach suggests that it would like us to reweigh the evidence, and reevaluate the credibility of the witnesses. Of course, that is not our task. (See *Laguna, supra*, 231 Cal.App.3d at p. 491.)

Disney's motion was untimely. (See, e.g., *Sammis v. Stafford* (1996) 48 Cal.App.4th 1935, 1942 [56 Cal.Rptr.2d 589] [a reviewing court must infer that the trial court made all factual findings necessary to support its decision].) Substantial evidence supports the court's implied ruling.

Disney security investigated the anonymous calls, but found no information on which it could act. No other information surfaced until October 1997, when SSI's counsel revealed SSI's possession of pages from the Restricted Items List. In its correspondence with Disney concerning the documents, SSI denied that it had any knowledge as to the source of the documents. Later, when Disney deposed Shirley Lasswell in October 1997, she denied any knowledge of Sands, and any knowledge whether SSI had hired someone to take Disney documents. After Disney moved for a protective order in March 1998, SSI's opposition to that motion still insisted that SSI had no idea how it obtained the Restricted Items List.

Under the evidence credited by the trial court, SSI's responses were either intentionally false, or made with deliberate indifference to the truth. Pati Slesinger and SSI's lawyers knew that Sands had surreptitiously taken documents from Disney property. SSI's agent, David Bentson, worked directly with Sands, receiving the documents and disseminating them to Slesinger, Lasswell, and SSI's attorneys. The court could reasonably infer that acting through its agents (Bentson and SSI's lawyers) and its principals (Slesinger and Lasswell) SSI either intentionally misled Disney, or deliberately made no reasonable effort to trace the Restricted Items List to Sands's activities. Nonetheless, SSI agreed to return all copies of the Restricted Items List it possessed, resulting in Disney withdrawing its motion for a protective order.

In January 2000, SSI served discovery responses, verified by Lasswell, stating that both the Patterson Memorandum and the Kaplan Note had been "produced by Disney" in discovery and that SSI had no other Disney documents that lacked a Bates stamp. By that time, of course, Lasswell had been informed by Pati Slesinger that SSI had employed an investigator to search Disney's "garbage," but her verified discovery response made no mention of this fact, and no mention of the thousands of pages of Disney documents SSI possessed. Lasswell had been faxed some of these documents by David Bentson as early as September 1993, when he faxed to her a page from the Interrogatory Tables containing a footer declaring the document to be confidential.

Not until the March 2002 deposition of Pati Slesinger did SSI first reveal that it had employed Sands to obtain Disney documents. In June 2002, Disney served Sands with a notice of deposition and a request that he

produce copies of all documents found in the course of his investigation for SSI. However, when he appeared for the deposition in September 2002, he brought no documents with him, and testified that although he had taken Disney documents from publicly accessible dumpster sites, he kept no record of the documents he took, and had none of them when he was served with the deposition subpoena.

After Sands's deposition, Disney wrote SSI, demanding copies of all documents taken from Disney. SSI responded that the papers Sands had found "were never used in the litigation in any way. . . . [T]hey have had no impact on the proceedings at all."

In October 2002, responding to subpoenas served by Disney, SSI began disclosing the bulk of what turned out to be more than 6,000 pages of Disney documents taken by Sands—documents produced from the files of Pati Slesinger, Shirley Lasswell, and SSI's counsel. Included among the documents disclosed was the June 7, 2002 File, consisting of 560 pages contained in a file labeled "Documents Received from Terry Sands *on 6/7/02*" (italics added), a date three days before Sands had been served to appear at his deposition. SSI did not reveal its possession of these documents until September 2003.

On this record, Disney did not unreasonably delay in making its sanction motion. The time lapse from the 1994 anonymous calls to the motion in February 2003 was caused not by Disney's lack of diligence, but by SSI's concealment of Sands's employment, its false or recklessly made claims to have no knowledge concerning how it came to possess internal Disney documents, and its refusal to give any hint as to the magnitude of the misconduct until forced to do so.

## 2. *SSI's Unlawful Conduct*

The trial court disbelieved Sands's testimony that he had only taken documents from Disney's Buena Vista Plaza facility. The court concluded that Sands committed "multiple trespasses over an extended period of years at many targeted facilities," including the Golden State facility, which was "a primary source of Disney documents procured by Sands." The court specifically credited the information contained in Richard Holman, Sr.'s first anonymous telephone call, in which Holman, Sr., said that he and Sands "went to [Disney] Dumpster locations, broke in and took copies of documents . . . from locations in Northridge, Burbank, Glendale and trash cans on Flower Street" and once "were able to get [past] the security guard at the Olive Building[,] enter some of the offices and take documents (i.e., contracts) off the desks." The court also found that, contrary to SSI's claims, the

dumpsters at Buena Vista Plaza were located on private (not public) property, that Disney did not abandon the documents contained in the dumpsters, and that Sands "had no right to trespass" to obtain the documents. Further, the trial court's statement of decision contains references to SSI's "unlawfully obtained" documents, and observes that "SSI had no right to break laws to obtain evidence."

On appeal, SSI does not challenge these findings, including the finding of civil trespass. But SSI observes that the trial court made no express finding of criminal trespass, and further urges that "[t]he charge of criminal conduct never was nor could be substantiated" because there was no showing that Sands's conduct included all of the required elements to establish either a criminal trespass (Pen. Code, § 602) or a violation of the Burbank ordinances governing trash containers.

 SSI's insistence that criminal trespass was neither proved nor found is puzzling. Regardless of whether Sands committed criminal trespass, the evidence credited by the court established that he improperly entered areas of Disney properties not accessible to the public and that he trespassed onto Golden State's secure facility and, at those locations, improperly took documents that Disney had not abandoned. He thus committed the crimes of theft (Pen. Code, § 484) and burglary (Pen. Code, § 459). In any event, whether characterized as civil wrongdoing, criminal wrongdoing, or both, Sands's misconduct in the name of SSI was deliberate and egregious—more than adequate to invoke the court's exercise of its inherent power to dismiss.

### 3. *SSI's Liability For Sands's Conduct*

The trial court concluded that SSI implicitly (if not expressly) sanctioned Sands's conduct. The court stated: "SSI claims it instructed Sands to only obtain Disney documents by lawful means, but SSI remains fully responsible for Sands' misconduct, even if his acts, as SSI's agent, were contrary to SSI's explicit instructions. [Citation.] In light of all the circumstances, SSI had to suspect Sands was engaged in questionable conduct and that he was procuring documents from many Disney sources. Yet, SSI failed to adequately supervise Sands' activities [and] essentially closed its eyes." In another passage, the court concluded that Pati Slesinger "knew all along" of Sands's illicit activities.

According to SSI, however, the court's reasoning "will not wash" because "[i]t is undisputed that [SSI's] counsel and David Bentson instructed Sands to obey the law" and "[t]here is no evidence that [SSI] (or its lawyers) knew that Sands was acting unlawfully." Rather, SSI "always understood" that Sands was searching publicly accessible dumpsters at the Buena Vista Plaza site.

SSI's argument suffers from two primary flaws. The first is legal: a litigant is vicariously liable for its investigator's intentional misconduct committed within the course and scope of employment. (See *Noble v. Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 659–663 [109 Cal.Rptr. 269]; see also 3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and Employment, § 185, pp. 235–237.) Indeed, "[i]t is immaterial that the employee acts in excess of authority or contrary to instructions." (3 Witkin, *supra,* § 165 at p. 208; see also *Martin v. Leatham* (1937) 22 Cal.App.2d 442, 445 [71 P.2d 336].) The policy rationale is clear: a contrary rule would permit an employer to reap the benefits of its employee's misconduct simply by claiming it had instructed the employee only to engage in lawful conduct. Hence, even if the trial court had accepted SSI's argument that Sands acted without authorization (an argument it rejected), Sands's unlawful conduct would still be imputed to SSI because it occurred in the course and scope of the investigation that SSI hired him to undertake. In short, Sands's deliberate misconduct is also the deliberate misconduct of SSI.

The second flaw in SSI's argument is factual: SSI relies only on the evidence that supports its position, and overlooks circumstantial evidence from which it may be inferred that SSI knew of Sands's illegal conduct, or at the very least acted with deliberate indifference to whether it was legal.

The evidentiary basis of SSI's argument is the testimony of David Bentson that he instructed Sands not to violate the law, and the testimony of Pati Slesinger that she knew of no violation of the law by Sands. The trial court, however, disbelieved this testimony, and credited the ample circumstantial evidence that contradicted it. Sands took thousands of pages of Disney documents and passed them on to Bentson, and through him to SSI's lawyers, Pati Slesinger, and Lasswell. The trial court could reasonably infer that the sheer volume of documents would lead a reasonable person to question whether more than one repository was being searched, especially if that person were truly concerned about ensuring the legality of the document searches. Of course, the SSI agent to whom Sands reported, David Bentson, gave Sands a free hand, and did nothing to supervise his activities or ensure they were legal. Further, some of the documents taken by Sands—the Restricted Items List, the Interrogatory Tables, the Fuller Memorandum, and the Suit Overview Document—bore conspicuous notations stating that Disney considered them to be privileged and confidential. Common sense suggests that such documents are not the type that a litigant would simply discard in publicly accessible trash dumpsters, as opposed to disposing of them in a more secure way.

Strong circumstantial evidence suggested that Pati Slesinger knew that Sands had taken documents Disney considered confidential. SSI's copies of

the Fuller Memorandum and the Interrogatory Tables bore September 1993 fax transmission legends indicating they were sent from Pati Slesinger's office. Also, SSI ultimately produced two sets of the Restricted Items List and the Interrogatory Tables: one set with the confidentiality markings as originally created by Disney, and one set without them. In testimony credited by the trial court, Disney's forensic document specialist, Erich Speckin, testified that the sets without the confidential markings, which came from Slesinger's files, were made from the set that did have those markings, which came from the files of SSI's attorneys. From this testimony, the court could reasonably infer that Pati Slesinger (or someone else on SSI's behalf) had altered one set of both the Restricted Items List and the Interrogatory Tables to omit any indicia of confidentiality. Moreover, in the years before Disney's sanction motion, SSI consistently concealed Sands's activities and its possession of Disney documents—a fact the trial court could reasonably interpret as demonstrating consciousness of guilt and a desire to keep the full extent of the misconduct secret.

This evidence leads to the reasonable conclusion, as found by the trial court, that SSI "had to suspect Sands was engaged in questionable conduct," and "[y]et . . . essentially closed its eyes." In other words, SSI, at best, acted with deliberate indifference to whether Sands's conduct was legal.

### 4. *SSI's Alteration of Documents With the Intent to Mislead*

As noted in the preceding part, the trial court found that copies of the Restricted Items List and Interrogatory Tables contained in Pati Slesinger's files had been altered by her or someone on SSI's behalf to delete all notations of confidentiality. The purpose of these alterations, the court inferred, was "to create the false impression" that the documents were not confidential, or the false impression (as argued by SSI at the sanction hearing) that Disney had created both confidential and nonconfidential sets. Based on Slesinger's demeanor as a witness and the evidence linking her to the documents, the court disbelieved her testimony that she was not responsible for the alterations.

On appeal, SSI does not challenge the trial court's finding that copies of the Restricted Items List and Interrogatory Tables produced by Pati Slesinger were altered. SSI argues, however, that there is no evidence that the alterations were made by Slesinger or anyone else *with the intent to mislead.* However, SSI points to no other motive suggested by the evidence. Indeed, the inference of intended deception is self-evident from the act of alteration: deleting confidentiality markings from illicitly obtained documents makes the documents appear nonconfidential, makes questions about their provenance less pointed, and makes their unexplained possession appear less blameworthy.

 SSI notes that in 2002 it first produced copies of the Restricted Items List and the Interrogatory Tables bearing the "confidential" markings, and then later produced the altered versions. According to SSI, this chronology undermines the inference that SSI intended to conceal from Disney its possession of confidential documents. The argument misses the point. SSI concealed its possession of documents with confidential markings *until* 2002, when it finally produced them. Its later production of the altered versions without the confidentiality markings says nothing about the purpose behind the alterations when they were made. In any event, as one federal appellate court has explained in upholding a terminating sanction for egregious misconduct, "[t]he failure of a party's corrupt plan does not immunize the defrauder from the consequences of [its] misconduct." (*Aoude, supra,* 892 F.2d at p. 1120.)

### 5. *The Usefulness of the Documents to SSI*

The trial court found that the illicitly obtained documents retained by SSI were "decidedly not useless. A number of key writings SSI retained are directly related to this litigation and reveal, among other things, privileged information useful to an opponent such as SSI." SSI contends that this finding is unsupported, because "each of the categories of papers mentioned in the trial court's ruling as potentially useful to Slesinger is either not privileged, not useful, or both."

In making its contention, SSI parses each document in isolation rather than considering the significance of the documents in totality. SSI also sanitizes its analysis by ignoring the illicit methods by which it obtained the documents and tried to keep its conduct secret. SSI claims that the conclusions in the Suit Overview Document "became hopelessly outdated years ago,"[22] and that the Fuller Memorandum was "benign" because it simply recited an analysis that Disney had already disclosed to SSI. SSI also claims that its possession of the Restricted Items List and the Interrogatory Tables, even if obtained through gross misconduct, is insignificant, because they contained information that SSI was otherwise entitled to obtain through discovery.

Contrary to SSI's approach, the proper focus is on the illicitly obtained documents considered as a whole, and on SSI's misconduct in obtaining the documents, concealing its wrongdoing, and making no accurate accounting of the documents it obtained or discarded. In this context, it was reasonable for the trial court to conclude that the fine distinctions drawn by SSI between useful and useless information carry little weight. The trial court could

---

[22] SSI's claim that the Suit Overview Document was not significant is at odds with the fact that when SSI finally produced the document, it attempted to conceal the confidential nature of the document by omitting its face page.

reasonably infer SSI learned more than individual pieces of information; it obtained an insight into Disney's confidential approach to the litigation—an insight SSI could use to its advantage in the litigation. Further, the court could also reasonably infer that SSI concealed its wrongdoing precisely because it found the theft of Disney documents useful and because it knew some documents were privileged. Indeed, the entries in SSI's redaction log suggest that Pati Slesinger, David Bentson, and SSI's attorneys made use of the stolen documents.

SSI's appellate claim that none of the stolen documents is useful also contradicts the position SSI took in the trial court. For instance, in 1997, when SSI first produced the Restricted Items List, it claimed the document was "clearly" "relevant" to its claim that Disney had failed to account for all Winnie the Pooh revenues. The next year, SSI attached a copy of the Restricted Items List to one of its discovery motions. In SSI's motion to use the Patterson Memorandum, SSI argued that the document supported its claim that Disney had defrauded SSI in accounting for Winnie the Pooh generated revenues, an argument SSI reiterated in its opposition to Disney's motion for terminating sanctions. In a supplemental pleading opposing terminating sanctions, SSI characterized the stolen documents as "shocking" because they showed Disney's accounting could "not be trusted" and that Disney had abused discovery procedures and had misled court-appointed auditors. In that pleading, SSI stated that it intended to file a sanctions motion "based on this proof." In its opening statement at the sanction hearing, SSI stated that some of the stolen documents supported its claim about Disney discovery abuses and that SSI intended to use the documents "for the purposes of conducting the discovery on the merits." Thus, in the trial court SSI consistently recognized that the information in the stolen documents was material both to the merits of the lawsuit (its claim of fraudulent accounting) and to its strategy (discovery litigation). SSI's own behavior thus demonstrates the materiality of the information it illicitly obtained.

### 6. The Trial Court's Rejection of the Proposal for Document Review Counsel

In its statement of decision on Disney's motion for a terminating sanction, the trial court concluded that it had no confidence that SSI would obey any prophylactic order, and that it was not convinced SSI had either produced or discarded all the illicitly obtained documents it possessed. The court also stated that SSI's principals knew information gleaned from stolen Disney documents that could not be purged. In its statement of decision on SSI's motion for new trial, in which it rejected SSI's proposal of DRC (see fn. 15, *ante*), the court reiterated the substance of these findings: "No power the Court possesses . . . can purge SSI's knowledge. The full extent of SSI's knowledge remains uncertain as does the potential impact of application of that knowledge to potential future litigation decisions and

events. No power the Court possesses short of termination can fully guard against the conscious or subconscious application of SSI's knowledge in shaping the future course of the litigation and its outcome." On this reasoning, the court rejected SSI's proposal for DRC.

SSI challenges the court's reasoning as pure speculation. The court's reasoning, however, relied not on speculation, but SSI's history of misconduct—a history that is reliably predictive. On the evidence credited by the court, SSI's pattern of misconduct was breathtaking. It reasonably suggested that SSI would not obey remedial orders if disobedience might be to its tactical advantage. (See *Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1184 [36 Cal.Rptr.3d 663] [terminating sanction was not an abuse of discretion because the trial court could have reasonably concluded that given defendants' "brazen violation of a discovery order," "a lesser sanction would not have been sufficient to compel compliance" with any future court orders].)

Similarly, the court reasonably concluded that SSI might well possess illicitly obtained documents that it had not produced or discarded. SSI never supervised Sands, never catalogued the documents he took, and never made any record of what SSI purportedly discarded. SSI and its former counsel (Greenberg Glusker) could not even account for SSI's possession of the June 7, 2002 File, and could provide no explanation why it was not produced until September 2003. (See fn. 7, *ante.*) Combined with the court's dismal view of the credibility of Pati Slesinger, Lasswell, and Bentson, SSI's history of duplicity or deliberate indifference to the truth concerning the illicitly obtained Disney documents reasonably cautioned against accepting SSI's protestations that it had produced all it possessed, and that nothing of value had been learned.[23] As the trial court cogently noted: "SSI is dishonest and shows no remorse."[24]

---

[23] Because the trial court's rejection of DRC is, in large part, based upon its finding that SSI cannot be trusted, we note additional findings that the trial court made in that regard.

For instance, the trial court found that the Sands declaration that SSI proffered in support of its October 2002 Motion to use the Patterson Memorandum constituted an attempt to mislead the court. In that declaration, Sands claimed that he searched only dumpsters at Buena Vista Plaza and two other unspecified locations. (See fn. 9, *ante.*) The court found that the declaration "was calculated to mislead the Court into believing incorrectly that Sands' activities were very limited in scope" and therefore was "willfully misleading and false and calculated to induce the Court to rely on deceptive, false testimony in deciding a motion in SSI's favor—an attempted fraud on the Court."

In addition, the trial court found that SSI's 1998 representation that it had returned all copies of the Restricted Items List was intentionally false. The court also found that "[c]ontrary to its representations to Disney and the Court, SSI knew how it had obtained the Restricted Items List and knew it bore conspicuous confidential markings when originally procured by Sands."

[24] Lasswell's death during the pendency of this appeal does not affect this conclusion. Our review is based upon the facts (including evidence of Lasswell's complicity in SSI's

Likewise, no speculation exists in the court's determination that SSI's principals had gleaned information from the documents that no court order could dissipate. Pati Slesinger and Bentson conceded reviewing documents. Notations made by them on certain documents were deleted by SSI as privileged before the documents were produced. Pati Slesinger (or someone else on SSI's behalf) altered copies of the Restricted Items List and Interrogatory Tables to remove notations of confidentiality. Bentson faxed at least some documents to Lasswell because he believed they would be of interest to her. To the extent there is any mystery as to how many documents SSI's principals reviewed, how many they discarded, how many they might still possess, and how valuable the information learned might be, the mystery is a direct result of SSI's misconduct. SSI is itself responsible for creating a record in which Disney's proof raised justifiable concerns on these points. SSI is also responsible for the dearth of credible evidence to alleviate those concerns.

SSI argues that the court's concern over SSI's lack of trustworthiness is not relevant in evaluating its proposal of DRC. According to SSI, whether the proposal is effective depends not on SSI's conduct, but on the conduct of new trial counsel and the DRC, who are officers of the court. However, from 1992 to 2002, SSI was represented by six different law firms (see fn. 2, *ante*). Despite the changes in representation, SSI's misconduct persisted. The one constant was the involvement of SSI's principals, Pati Slesinger and Shirley Lasswell, and SSI's agent, David Bentson. (See fn. 24, *ante*.) The court could reasonably conclude that with SSI as the client, employment of new trial counsel and DRC would be inadequate to protect against SSI's use of improperly obtained information. (See *Lipin v. Bender* (Ct.App. 1994) 84 N.Y.2d 562 [644 N.E.2d 1300, 620 N.Y.S.2d 744, 748] [the plaintiff personally stole, copied and reviewed documents protected by the attorney-client privilege and work product doctrine; dismissal of her lawsuit was not an abuse of discretion because "the wrongdoing and the knowledge were the client's own, which she would carry into any new attorney-client relationship"]; *Perna v. Electronic Data Systems, Corp.* (D.N.J. 1995) 916 F.Supp. 388, 400 [the plaintiff personally took and photocopied privileged documents; ordering the plaintiff to obtain new counsel would "be ineffective as [the plaintiff] would have already tainted the entire litigation process by this intrusion"].)

---

*misconduct)* presented to the trial court when it made the contested ruling. In any event, Lasswell's death does nothing to alter the trial court's fundamental conclusion that SSI cannot be trusted. Pati Slesinger, SSI's sole shareholder and Lasswell's daughter, managed the lawsuit against Disney and was actively involved in the misconduct, including the review of confidential Disney documents.

Moreover, it is not reasonable to expect new trial counsel to fulfill, in any meaningful way, a screening or prophylactic function to preclude SSI's principals from introducing into the litigation the fruits of Sands's searches. Trial counsel would have a duty to zealously represent SSI, but would be placed in an adversarial position, having to forcefully inquire about, and perhaps investigate, the source of documents produced by SSI, or ideas and suggestions made by SSI.[25] Further, on the record presented the trial court could reasonably doubt that SSI would honestly cooperate with new trial counsel's efforts. (See *Lipin v. Bender, supra*, 620 N.Y.S.2d at pp. 748–749 [the trial court reasonably concluded that "policing" an order requiring "the plaintiff to establish, once new counsel was in place, an independent source for any information" that could otherwise have been obtained from the stolen documents was not an adequate safeguard given the nature and persistence of the plaintiff's misconduct].)

Simply put, the trial court was not required to gamble its ability to provide a fair trial on SSI's turning over a new leaf. The court did not abuse its discretion in rejecting SSI's proposal of DRC,[26] and concluding that dismissal was the only viable sanction.

Our conclusion that the trial court did not abuse its discretion in rejecting SSI's proposal of DRC disposes of SSI's claim that imposition of the terminating sanction was punitive. As framed by SSI, a sanction is punitive if a lesser sanction is "more than sufficient to remedy the effects of any misconduct." (Boldface and capitalization omitted.) However, because the trial court acted well within the bounds of reason in rejecting SSI's proposal

---

[25] For instance, SSI explains: "The origin of any papers provided by [SSI] would be scrutinized by new trial counsel; if there were any doubt about the papers' provenance, new counsel would have to ask where the papers came from. If [SSI] couldn't provide a satisfactory answer, new trial counsel could not accept or use the papers."

[26] In its opening brief, SSI has added one more task for DRC to perform: "DRC should promptly review [SSI's] files and place any [improperly obtained Disney] Papers found therein with the other Isolated Documents." We need not consider this point because it was not raised in the trial court. (See *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847 [60 Cal.Rptr.2d 780].) To do so would be unfair to Disney, which did not have the opportunity to respond to it below, and to the trial court, which was unable to evaluate it. In any event, the additional role that SSI now proposes for DRC is based upon the premise that SSI would honestly cooperate by not first removing any remaining illicitly obtained Disney documents before giving DRC access to its files. As explained above, the trial court reasonably concluded that SSI could not be trusted. That conclusion applies with equal force to SSI's new proposal.

of DRC (the only alternative sanction proposed by SSI), its finding that dismissal was the only sanction that could protect Disney cannot be deemed punitive.

## 7. The Earlier Sanctions Imposed On Disney

SSI observes that Disney was subject to evidentiary and monetary sanctions for its destruction of certain files of Vincent Jefferds, the Disney vice-president who negotiated the 1983 licensing agreement.[27] Although SSI concedes that "two wrongs do not make a right," it argues that the terminating sanction entered on Disney's motion is an improper windfall to Disney. According to SSI, the terminating sanction relieves Disney "of the consequences of its own wrongful destruction of evidence for which Disney had been [previously] severely sanctioned by another judge" and of the duty to defend this lawsuit and, as a result, puts Disney "in a better position than it would have been in had [SSI's] investigator never peered into a single garbage dumpster."

The earlier sanctions against Disney, however, provide no cover for SSI's misconduct. The evidentiary sanctions against Disney (assuming they were properly entered, see fn. 27, *ante*) rectified the harm done *to* SSI. The terminating sanction imposed against SSI rectified the harm done *by* SSI. In obtaining a terminating sanction against SSI, Disney did not "get away" with its own misconduct. The demise of SSI's lawsuit has one cause only: the deliberate and egregious misconduct of SSI itself, making any sanction other than dismissal inadequate to ensure a fair trial.

---

[27] In 1999, SSI discovered that three years after SSI filed suit, Disney destroyed the documents. SSI moved for sanctions. After conducting a series of hearings, the trial court (a different judge from the one who imposed the terminating sanction against SSI that is the subject of this appeal) found that "a jury could conclude that Disney's destruction of Jefferds' files was done willfully or that Disney willfully suppressed evidence." In 2001, the court imposed a panoply of evidentiary sanctions against Disney relating both to the destruction of the files and to representations that Jefferds made to SSI's principals about, among other things, SSI's right to receive royalties on Winnie the Pooh videocassettes. In addition, the trial court imposed financial sanctions on Disney to reimburse SSI and its counsel for the cost of litigating the sanctions motion.

Disney appealed the trial court's order imposing monetary sanctions. However, after SSI and its counsel renounced entitlement to the monetary sanctions, we dismissed the appeal as moot. In our nonpublished opinion (*Slesinger, Inc. v. The Walt Disney Company* (Nov. 20, 2002, B153920)), we denied Disney's request to review the underlying evidentiary sanctions order. We observed that "[q]uestions remain as to the underlying correctness of the trial court's adjudication on sanctions." (*Ibid.*) But we declined to review the adjudication "under the guise of an otherwise moot monetary sanction order." (*Ibid.*)

## DISPOSITION

The judgment (order of dismissal with prejudice) is affirmed. Disney is awarded its costs on appeal.

Manella, J., and Suzukawa, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 3, 2008, S157910. George, C. J., and Werdegar, J., did not participate therein.