Filed 12/5/14  Barragan v. County of Los Angeles CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| VERONICA BARRAGAN, | B245832 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. Nos. MC020485 and MS006356) |
| v. | |
| COUNTY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Randolph Rogers and James C. Chalfant, Judges.  Reversed.

Liddy Law Firm and Donald G. Liddy; Law Office of Barry M. Wolf and Barry M. Wolf for Plaintiff and Appellant.

Coleman & Associates, John M. Coleman; Greines, Martin, Stein & Richland, Timothy Coates and Carolyn Oill for Defendant and Respondent.

Plaintiff and appellant Veronica Barragan was rendered quadriplegic in a single-car rollover accident. She brought suit against respondent County of Los Angeles (County) for dangerous condition of the road where the accident had occurred. County prevailed on two dispositive motions. First, County obtained an order dismissing the action on the basis that Barragan had committed fraud on the court in prior proceedings in which she had obtained relief from the requirements of the Tort Claims Act (Gov. Code, § 905, et seq., TCA). Second, County obtained summary judgment on the basis that the road where the accident occurred did not constitute a dangerous condition as a matter of law. We conclude that the dismissal order is not supported by the evidence. We further conclude that triable issues of fact exist on the issue of dangerous condition. We therefore reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

1.    *The Accident*

The accident occurred on April 12, 2007, at approximately 9:00 p.m. Barragan has no memory of the accident, and there were no eyewitnesses. The exact mechanism of the accident is disputed by the parties. This much is undisputed: (1) the accident occurred in a rural area in an unincorporated area of County; (2) the weather was clear; (3) there were no street lights; (4) Barragan was driving alone in a Honda Civic; (5) she had been drinking;[1] (6) Barragan was driving westbound on Palmdale Boulevard;[2] (7) at

---

[1]    Barragan's blood alcohol concentration at the time of the accident is unknown. The original blood sample could not be analyzed due to clotting. County's experts attempted to extrapolate Barragan's blood alcohol concentration from her plasma alcohol concentration, her known alcohol consumption, and the time that had passed between the accident and the sample draw. One of County's experts concluded Barragan's blood alcohol concentration at the time of the accident was 0.04%; another concluded it was 0.023% (using "the most conservative assumptions"). The CHP officer who prepared the accident report initially concluded that the primary cause of the accident was that Barragan had been driving under the influence. When the initial blood sample proved unanalyzable, the CHP officer then supplemented the report, stating that Barragan's level of impairment due to drinking was "unknown," and concluding the primary cause of the accident was instead Barragan's "unsafe turning movement."

2

the accident location, Palmdale Boulevard consists of one lane in each direction, which is approximately 12 feet wide; (8) there is a reflective double yellow line in the center of the road; and solid white reflective edge lines on the sides of the road; (9) outside the reflective white line, there is a small paved shoulder of approximately 2 feet,[3] with a dirt shoulder beyond; (10) at or near the location of the accident, westbound Palmdale Boulevard curves to the left, to go around a hill (to the right); (11) ahead of the curve, there is a plainly visible advisory "Curve" sign, and an equally visible advisory "45 MPH" speed sign; and (12) somewhere at or near the location of the curve, Barragan's car went off the road to the right, where it went onto the dirt shoulder, and subsequently rolled over, up and down the hill.

As noted above, the precise way in which the accident occurred is disputed. County takes the position that Barragan, for reasons relating to her own lack of due care, simply drove off the road to her right, where she then rolled her car on the hill. Barragan, in contrast, argues that she missed the entry to the curve due to lack of visibility, which resulted in the right wheels of her car leaving the paved road and entering the soft shoulder. Feeling her car on the uneven surface, she pulled the wheel strongly to the left, which brought her over the center line. She then overcorrected again to the right, which caused her car to leave the road and crash into the hill.

2.      *The Proceedings for Relief from the TCA*

Barragan desired to bring suit against County. However, she had not timely filed a claim with County under the TCA. She therefore filed a petition with the trial court seeking relief from the TCA filing requirements, on the basis of excusable neglect. The trial court denied the petition, but suggested Barragan could nonetheless file suit against County, asserting delayed discovery. Barragan appealed the trial court's order denying her relief from the TCA requirements. We reversed. (*Barragan v. County of Los Angeles*

---

[2]      Barragan had initially been driving eastbound, but made a U-turn prior to the accident. There is no suggestion that the U-turn played any part in the accident.

[3]      Barragan contends the paved shoulder was less than two feet wide at the point of the accident.

3

(2010) 184 Cal.App.4th 1373.) The disposition of our opinion directed the trial court to enter an order granting Barragan relief from the TCA requirements.[4] (*Id.* at p. 1387.)

### 3. *The Instant Action*

While the appeal of Barragan's petition for relief from the TCA requirements was pending, Barragan filed the instant action against County. The action was stayed pending our resolution of the appeal. When our remittitur issued, the stay was lifted.

The operative complaint is Barragan's first amended complaint. It alleges dangerous condition of public property. Barragan alleged several defects in the design, construction, and maintenance of the road at the point of the accident. Although Barragan's complaint identified multiple ways in which the road was allegedly dangerous, the litigation of this action would ultimately focus on the visibility of the curve and the makeup and slope of the soft dirt shoulder.

### 4. *The Dismissal for Fraud*

Before litigating the merits of the action, however, the attention of the parties was directed to the issue of whether Barragan had committed fraud on the court in connection with her petition for relief from the TCA. Specifically, County took the position that, in connection with her petition, Barragan, her counsel, and her family had all represented that Barragan's injuries had been too devastating for her to have even considered seeking legal advice during the TCA claim period. However, it was ultimately revealed that, although Barragan herself had not attempted to seek representation during this time, her mother had met with an attorney, and her fiancé had taken certain acts to investigate the accident (including taking many photographs of the scene).

In order to properly discuss the motion to dismiss, it is important to discuss the procedural circumstances that led to it. When Barragan petitioned for relief from the TCA, she supported her petition with declarations of herself and her fiancé, setting forth the severity of Barragan's injuries and their impact on her daily life. There was no discussion of any attempts to investigate the accident or contact counsel made on

---

[4] Although, for reasons that are unknown, no such order was ever entered, the parties and the trial court proceeded as though it was.

4

Barragan's behalf. Barragan's mother did not submit a declaration at all. Barragan's fiancé's declaration was limited to discussing Barragan's limitations. The only mention of whether an attorney was contacted appeared in Barragan's declaration, in which she stated, "Because of my injuries, long hospital stay and the time I spent at home recuperating, I was not able to give much thought to speaking to an attorney. It was only after a long recovery period that I was able to even consider hiring an attorney."

The trial court denied Barragan's petition for relief from the TCA on the basis that there could be no excusable neglect in the absence of an attempt to contact counsel. Barragan timely appealed that order.

While the appeal was pending, Barragan moved for a limited remand on the basis of newly discovered (or, more appropriately, newly remembered) evidence. In a discussion with counsel after the trial court's ruling, Barragan's fiancé revealed that Barragan's mother had, in fact, contacted counsel while Barragan herself was still hospitalized. Barragan's counsel supported the motion for remand with: (1) a declaration of Barragan's mother, indicating that she had spoken with counsel while Barragan was in the hospital, and that she had told Barragan that counsel declined the representation; (2) a declaration of Barragan, indicating that she had no recollection that her mother told her about an attempt to retain counsel while she was in the hospital; (3) a declaration of Barragan's fiancé, indicating that he, too, had forgotten about Barragan's mother's attempt to hire an attorney, until counsel informed him that the failure to attempt to retain counsel was the reason the trial court denied Barragan relief; and (4) a declaration of counsel, indicating that, when he had interviewed Barragan, he had only asked her about *her own* efforts to obtain counsel, and had not considered the possibility that someone might have independently sought counsel on her behalf.[5]

County opposed the motion for a limited remand. County argued that there was no legal basis for such an order. County further argued that the newly discovered

---

[5] The motion was also supported by a declaration of the prior attorney Barragan's mother had contacted, confirming the contact and his decision to decline the representation.

5

evidence would not have compelled a different result in the trial court. We denied the motion for limited remand.

We did, however, reverse the trial court's order, concluding that it was not necessary that an injured party attempt to obtain counsel in order to establish excusable neglect. We concluded that disability alone could establish excusable neglect. As the trial court had expressly indicated that it would find excusable neglect if the failure to seek counsel did not constitute a bar to relief, we directed the trial court to grant Barragan's petition for relief. At no point did County request that we, instead, remand the action to the trial court for reconsideration of the issue of excusable neglect on the basis of the newly disclosed evidence that Barragan's mother had contacted counsel.

As such, the instant action proceeded. At some point, County sought access to the file of the attorney who had declined the representation. The trial court agreed to review the file, out of a concern that there might be correspondence in the file inconsistent with statements made under oath by Barragan in her petition for relief from the TCA. Specifically, the court was concerned with whether the attorney had specifically informed Barragan's mother of any "impending claim filing deadlines." If so, this would undermine Barragan's claim of excusable neglect. The court reviewed the attorney's letter to Barragan declining the representation.[6] The letter was a standard non-engagement letter; it indicated that Barragan should contact another attorney if she sought to pursue the action, and generally noted that time limitations may apply. It made no specific mention of the TCA.

Nonetheless, the court concluded that this letter was "materially inconsistent with declarations submitted to the court in the course of requesting leave to [file] a late government[] claim." The court stated that the declarations had indicated that the first time Barragan had consulted with counsel was in February 2008, but this was clearly false because Barragan's *mother* had consulted counsel months earlier.

---

[6] The letter, dated June 18, 2007, was sent to Barragan at her home. Barragan was still in the hospital at this time. There is no evidence that Barragan's family showed her the letter or read it to her.

6

Buoyed by the court's suggestion that Barragan's declarations were false and misleading, County moved to dismiss the action for fraud pursuant to the court's inherent authority. County submitted evidence that, not only had Barragan's mother contacted an attorney and told Barragan about this (while Barragan was still hospitalized), but Barragan had responded that she had also thought of looking for an attorney. County further submitted evidence that Barragan's fiancé had not only taken photographs of the accident scene, but had also gone to the store where Barragan bought alcohol prior to the accident, and obtained the store's surveillance video. Neither of these facts had been mentioned in the declarations submitted in connection with Barragan's petition for relief from the TCA.

County argued that the efforts taken by Barragan's mother and fiancé to obtain counsel on Barragan's behalf were intentionally hidden from the courts[7] in connection with Barragan's petition for relief from the TCA, because Barragan believed that if these efforts were disclosed, the courts would not find excusable neglect in her failure to comply with the TCA. As such, County argued that Barragan had committed fraud on the court,[8] and requested that the court dismiss the instant action for the alleged fraud.

---

[7] That such facts were not disclosed to the trial court (whether by design or forgetfulness) cannot be disputed. However, it also cannot be disputed that many of these facts were, in fact, disclosed to the Court of Appeal. Indeed, if it were not for Barragan's voluntary disclosure of the facts to this court, made while the appeal was pending, it is unlikely County ever would have learned of Barragan's mother's efforts to obtain counsel on her behalf.

[8] County also argued that Barragan committed fraud on the court in that she had represented that once she was released from the hospital, she "did not even leave the house" for two months, while she, in fact, appears to have attended one or more medical appointments during this time. While this may have been a misstatement, it is not a material one. County does not suggest that Barragan was not, in fact, rendered quadriplegic in the accident, nor does it dispute her contention that she spent the TCA claim period either in the hospital, at a rehabilitation facility, or virtually confined to her bed, wholly unable to care for herself. That, during this period, Barragan may have left her home for necessary medical appointments (a difficult and painstaking process which was *fully set forth* in declarations submitted to the trial court in the TCA action) is a fact which would have had no effect on our disposition of the appeal in that case. Indeed, the

County argued that the court had jurisdiction to dismiss for fraud as part of its inherent powers.

In opposition, Barragan argued that there was no fraud, and that, in any event, this court's opinion in the prior appeal was binding in the instant action, either under the doctrine of law of the case or collateral estoppel.

In reply,[9] County argued that the trial court in the instant action had the duty to undertake a de novo review of Barragan's petition for relief from the TCA, because the order granting her relief from the TCA constitutes a condition precedent to her complaint proceeding in the instant action.

At the hearing, the trial court indicated a reluctance to grant the motion to dismiss, believing that it lacked jurisdiction to do so. However, it took the matter under submission, and ultimately granted the motion. The court concluded that Barragan had engaged in deliberate and egregious misconduct in the course of litigation, by failing to disclose the active steps taken by her family to investigate the accident and obtain counsel. The court found that Barragan's "bad faith [was] manifest," as she had successfully pursued a scheme that plainly interfered with the machinery of justice. Concluding that lesser sanctions would not be appropriate, the court dismissed Barragan's action.

---

trial court properly did not rely on this purported intentional misstatement as a basis for its finding of fraud on the court.

[9] In County's reply memorandum, it argued that the fact that Barragan's mother had spoken with Barragan in the hospital about her attempt to contact counsel "was unknown to the [c]ourts below." Obviously, neither this court nor the trial court in the TCA action is a court "below" the trial court in the instant matter.

5.    *Summary Judgment*

County's motion to dismiss was ultimately heard and ruled upon at the same time as County's motion for summary judgment.  County obtained summary judgment on the basis that the road did not constitute a dangerous condition as a matter of law.[10]

As movant, County's evidence on dangerous condition[11] addressed two issues: (1) the visibility/warning of the curve; and (2) the dirt shoulder.[12]  We consider County's evidence on each issue, as well as Barragan's evidence in opposition, separately.

A.    *The Curve*

It is undisputed that the "Curve" and "45 MPH" signs were visible.  It is also undisputed that the yellow center lines and white edge lines were painted in reflective paint, which could be seen when lit by a car's headlights.

City offered the evidence of a "human factors" expert on the issue of whether, "when driving at a speed appropriate for conditions, there is sufficient roadway

---

[10]    Barragan argues that County did not *seek* summary judgment on this basis.  The issue is a close one.  County's notice of motion indicated that it sought summary judgment on the bases of lack of causation and lack of *notice* of any dangerous condition, not on that basis that there was no dangerous condition.  However, the motion itself briefly argued that the property was not in a dangerous condition at the time of the accident,  and County offered expert testimony on the issue.  Although Barragan's opposition argued that County did not move on the basis that the property was not in a dangerous condition, Barragan nonetheless argued the issue.  We therefore conclude the issue was properly before the trial court.

[11]    County sought summary judgment on other bases; the court did not address these grounds and County does not attempt, on appeal, to argue that the motion should have been granted on the alternative bases.  We therefore limit our discussion to whether the property was not in a dangerous condition as a matter of law.

[12]    County also introduced evidence on the issue of the accident history at the accident location, with the intent of showing that the location was not dangerous because numerous drivers safely navigated it without incident.  While a lack of history of accidents can be relevant to the issue of dangerous condition, an absence of evidence cannot be dispositive of the issue.  (*Lane v. City of Sacramento* (2010) 183 Cal.App.4th 1337, 1346.)  As we will ultimately conclude a triable issue of fact existed as to whether the road constituted a dangerous condition, the evidence of accident history is irrelevant to our disposition of the appeal.

9

information provided to the driver that he or she is able to determine the roadway alignment far enough in advance to be able to successfully negotiate any curves in the roadway." The expert believed that this standard was satisfied by the curve in the instant case. The painted white and yellow lines, as seen in photographs of the accident scene, "appear to be in excellent condition and thus should have sufficient retroreflectivity such that they are visible under (1) low beam headlights for at least 150 feet, and (2) under high beam headlights for at least 450 feet." Assuming that, on a rural road without artificial lighting, a driver using due care would use high beam headlights in the absence of an oncoming vehicle,[13] the expert concluded that 450 feet of "roadway directional preview is more than sufficient for a driver using due care to be able to determine a curve is approaching, and to appropriately negotiate that curve." Similarly, County submitted the declaration of an expert civil and traffic engineer, who concluded that the advisory signs and reflectorized yellow and white lines all provided adequate warning and delineation for westbound motorists to safely travel through the curve.

In opposition to the motion, Barragan submitted the declaration of an expert engineer, with a specialty in accident reconstruction. The expert concluded that nighttime visibility of the curve was limited, due to "the curvature of the road, the uphill approach and the vertical elevation changes in the curve." He concluded that "an approaching motorist has limited visibility of the painted lines and will have difficulty seeing the curve until entering the curve, particularly at night." The expert concluded that, "[e]ven at the advisory speed of 45 miles per hour, the curve is not sufficiently recognizable at night." The expert relied on a photograph, exhibit 8, which was taken from a vehicle operating its high beams, and appears to show the reflectorized lines disappearing from view a relatively short distance ahead of the vehicle, apparently due to the change in elevation as the road curves downward, out of view.

Barragan also submitted the declaration of an expert civil and traffic engineer, David Royer. Royer believed the curve was dangerous because the road ahead of the

---

[13]     If there were oncoming vehicles, the expert concluded that a driver would be able to determine the curvature of the road by observing the path of the oncoming vehicles.

10

driver disappears ahead of the driver's vision. He testified that the 45 miles per hour speed limit sign "actually exacerbates the dangerous condition," because a driver proceeding at that speed would not be able to see the curve until it would be too late to safely enter the curve. Indeed, Royer testified that he personally drove the road at night and "could not see the pavement markings 200 feet ahead of the location of the crash. The roadway edge line disappears due to the curve of the road and the crown in the road near the location of the crash."[14] Royer "could not visualize the curve in the roadway a safe and sufficient distance ahead, even traveling at the advisory speed of 45 mph." Royer also disagreed with County's expert on the issue of headlights, stating that a driver "using due care would not necessarily use high beams even if there was no oncoming vehicle."

### B. *The Dirt Shoulder*

Anticipating Barragan's argument that the dirt shoulder was not built to standards in the profession, County submitted the declaration of its expert civil and traffic engineer, who stated: "It is common practice that highway design guidelines for non-mountainous areas are not always fully met in regards to dirt shoulder widths and slopes in mountainous terrain where topography and drainage concerns preclude – from a cost benefit standpoint – the construction of wider and flatter dirt shoulders." The expert testified that the dirt shoulder, outside the 2-foot paved shoulder, was "comprised of mostly compacted native, and some imported, material able to withstand a vehicle's weight – without appreciable deformation."

As anticipated, Barragan's expert, Royer, testified that the dirt shoulder was both sloped too steeply and made of too soft a material. Royer testified that the dirt shoulder "drops off steeply" at the outside of the curve, with a 20-25% "shoulder slope." He testified that the shoulder on the outside of a curve should not exceed a 5% slope.

---

[14] Royer testified that reflective chevron signs could have been posted along the outside edge of the curve to alleviate its dangerous condition. Such signs are visible up to 1000 feet away and are located well above the pavement surface, indicating the direction and location of a curve. Due to the accident history at the location, County did, ultimately, install such chevrons, years after Barragan's accident.

11

Further, he testified that the shoulder should not have been comprised of sand and soft dirt, but should have been composed of "class 2 shoulder material or an equivalent such as decomposed granite." Royer relied on standards set forth in the Cal Trans highway design manual, and stated that "[n]o reasonable engineer would have deviated from these standards, regardless of whether the road was straight or curved to avoid an obstacle such as a hill." He concluded that the state of the dirt shoulder alone rendered the accident location dangerous, explaining that "[t]raffic engineers anticipate that motorists will not always use reasonable and proper caution or be attentive and will depart the travelled roadway particularly at the outside of a curve; therefore, the engineers plan accordingly" and permit only a slight slope and require stronger material. Barragan's accident reconstruction expert agreed, stating that "[d]rivers, in general, tend to run off the road at the outside of a curve; therefore, a steep and soft curve shoulder at this location is dangerous. The minimally paved shoulder, soft dirt and steep slope of the soil adjacent to the curve(s) will increase the likelihood of loss of control once the vehicle wheels travel into the shoulder area and in and of itself create a dangerous condition for the motoring public when used with due care."

C. *The Trial Court's Order*

The trial court granted summary judgment on the basis that the road did not constitute a dangerous condition as a matter of law. With respect to the curve, the trial court concluded that the "Curve" sign, speed advisory, and reflective white line rendered the curve not dangerous as a matter of law. Reviewing the photographs, the court concluded that the "reflective white stripe on the right edge of the road alerts the driver to the presence of the curve." While the court acknowledged that Barragan's experts concluded that this was insufficient, the court relied on its own independent review, and determined no triable issue of fact existed.

With respect to the dirt shoulder, the court focused on the sentence in Royer's declaration stating, "[t]raffic engineers anticipate that motorists will not always use reasonable and proper caution or be attentive and will depart the travelled roadway particularly at the outside of a curve; therefore, the engineers plan accordingly." The

12

court interpreted this as an admission "that the only manner in which the drop from the paved shoulder onto poorly compacted material would be dangerous is if a motorist does not use reasonable and proper caution or is not attentive." As a roadway is only dangerous if it presents a risk to a driver utilizing due care, the court concluded that any defect in the dirt shoulder could therefore not constitute a dangerous condition as a matter of law.

> 6.    *Judgment and Appeal*

The court entered judgment in favor of County. Barragan filed a timely notice of appeal.

## *ISSUES ON APPEAL*

We first consider whether the trial court erred in dismissing the action for Barragan's alleged fraud in connection with her petition for relief from the TCA. We conclude that, even construing the facts in the light most favorable to the court's order, the trial court abused its discretion in finding Barragan committed fraud on the court, which could only be remedied by dismissing her action. Therefore, the dismissal must be reversed. Second, we consider the motion for summary judgment. We conclude that triable issues of fact exist as to whether the curve and dirt shoulder, both separately and in combination, constituted a dangerous condition of public property. Therefore, the summary judgment must also be reversed.

## *DISCUSSION*

> 1.    *The Order of Dismissal Must Be Reversed*

The trial court granted County's motion to dismiss on the ground that Barragan had committed fraud on the court in her petition for relief from the TCA–specifically, that Barragan obtained relief from the requirements of the TCA by submitting false declarations.

Any discussion on dismissals for fraud on the court must begin with *Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736 (*Slesinger*), the case of first impression in which it was recognized that trial courts have the inherent power to impose a terminating sanction "when a plaintiff's deliberate and egregious misconduct

13

makes any sanction other than dismissal inadequate to ensure a fair trial."[15] (*Id.* at p. 740.) The *Slesinger* court repeatedly explained that dismissal was only available in cases of "deliberate and egregious misconduct."[16] (*Id.* at pp. 740, 761, 764.) Moreover, dismissal is only appropriate "when no lesser sanction would be effective to cure the harm." (*Id.* at p. 760.) The trial court may only dismiss when the conduct "renders any remedy short of dismissal inadequate to preserve the fairness of the trial." (*Id.* at p. 764.)

We review an order of dismissal for abuse of discretion. "We view the entire record in the light most favorable to the court's ruling, and draw all reasonable inferences in support of it. [Citation.] We also defer to the trial court's credibility determinations. [Citation.] The trial court's decision will be reversed only 'for manifest abuse exceeding the bounds of reason.' [Citation.]"[17] (*Slesinger, supra,* 155 Cal.App.4th at p. 765.)

---

[15] It cannot seriously be disputed that the misconduct at issue in *Slesinger* was substantially more egregious than the misconduct (if any) at issue in the instant matter. In *Slesinger*, plaintiff hired an investigator to surreptitiously obtain documents from defendant. The investigator took *thousands* of pages of defendant's documents, including those marked privileged and confidential. He obtained the documents by "breaking into" defendant's office buildings and secure trash receptacles, and by trespassing onto the secure facility of the company defendant had retained to destroy its confidential documents. Plaintiff and its attorney reviewed the documents and, for years, concealed the investigator's activities from defendant and the court. (*Id.* at p. 740.)

[16] The *Slesinger* court noted that other courts have used different characterizations of the level of misconduct necessary to invoke the court's inherent dismissal powers, including the standard used by the trial court in the instant case, "fraud on the court." (*Slesinger, supra,* 155 Cal.App.4th at p. 764, fn. 20.) The *Slesinger* court neither accepted nor rejected these standards. It concluded that they "may be helpful," but the court ultimately "prefer[red]" to use the "deliberate and egregious" standard. (*Ibid.*)

[17] Barragan suggests an order of dismissal for deliberate and egregious misconduct should only be made on clear and convincing evidence, and that our standard of review should incorporate such a requirement. We need not reach the issue, and simply use the standard of review set forth in *Slesinger*.

14

In this case, it is important to note what the trial court actually found, and what it did not.[18] It did not find any *express* misstatements in any of Barragan's declarations; but instead found an implied misstatement, in that Barragan's declarations implied that her entire family was too preoccupied with her devastating injuries to consider seeking counsel, when this was not, in fact, the case. The court stated: "In the present circumstances, Plaintiff and her family's bad faith is manifest. Convinced that disclosing [her fiancé's] detective work and [her mother's] consultation with an attorney would lessen their chances of convincing the trial court of Plaintiff[']s excusable neglect, Plaintiff and her family fabricated a story of near incapacity and all consuming familial absorption in Plaintiff[']s recovery, followed by the serendipitous airing of [an attorney's] television commercial. When they discovered that the trial court was unwilling to grant them relief without consulting an attorney, lo and behold, Plaintiff[']s mother had consulted an attorney, on her behalf, and just happened to have forgotten up until then that she had done so."

Considered in the light most favorable to the trial court's ruling, the evidence supports this view of the facts. We are, however, troubled by the conclusion that this constitutes deliberate and egregious misconduct. There were no false discovery answers given; there was no affirmative statement made that Barragan's fiancé did not investigate or Barragan's mother did not contact counsel. More importantly, there is no indication that the declarations submitted by Barragan *purported* to address every fact conceivably relevant to the determination of excusable neglect, rather than the facts Barragan believed best supported her case. This is simply a situation in which a movant submitted declarations which did not contain potentially adverse information, but did not purport to set forth all potentially relevant facts.[19] While there is no precise definition of deliberate

---

[18]    It made no finding that Barragan's counsel was, in any way, involved in any wrongdoing.

[19]    In connection with its motion for summary judgment, County submitted the declaration of its expert civil and traffic engineer to the effect that, in the 6.5 years prior to the accident, there was only one accident similar to Barragan's. Barragan offered

15

and egregious misconduct, the term must mean something more than the submission of declarations which fail to volunteer potentially adverse information on a topic not addressed.[20] With no evidence that County ever actually *questioned* Barragan and her family regarding their efforts to contact counsel, Barragan's withholding of that information is not deliberate and egregious misconduct.

Moreover, even if Barragan's declarations constituted deliberate and egregious misconduct, we conclude that, as a matter of law, the misconduct did not render any remedy short of dismissal inadequate to preserve the fairness of the trial. The trial court concluded that dismissal was necessary because no lesser remedy was available. The court recognized that it was barred from reconsidering the order granting relief from the TCA in light of the newly disclosed evidence; it concluded that, in the absence of a such a remedy, dismissal was "the sole avenue to contest the appropriateness of [p]laintiff's late claim on the basis of these newly discovered facts."[21] In other words, the court ordered dismissal (the most severe remedy available) because reconsideration (the appropriate way of addressing newly disclosed information) was procedurally barred.

testimony suggesting that there were a great deal more similar accidents. If it is ultimately determined that there were multiple similar accidents, it would not follow that County's expert was committing deliberate and egregious misconduct when he stated there was only one similar accident, nor that County committed fraud by presenting evidence which painted a picture of a minimal accident history. Instead, the issue of *which* accidents were relevant is one to be resolved by testimony and argument. The expert was not *required*, in his declaration in support of the County's position, to identify every accident ever occurring at the scene and explain why it was not relevant.

[20]     In *Appling v. State Farm Mutual Automobile Insurance Co.* (9th Cir. 2003) 340 F.3d 769, 780, the court stated that "[n]on-disclosure, or perjury by a party or witness, does not, by itself, amount to fraud on the court."

[21]     This is something of an odd statement. The court did not *consider* "the appropriateness of [p]laintiff's late claim on the basis of these newly discovered facts," but instead dismissed the action on the basis that the previous withholding of the newly discovered facts constituted deliberate and egregious misconduct. Whether the trial court considering the petition for relief from the TCA would or would not have found Barragan's neglect excusable had the newly discovered facts been before it is an issue which has not been addressed by any court.

16

But Barragan *had sought* reconsideration in light of the newly disclosed information. Barragan had asked this court to remand the matter to the trial court for reconsideration in light of it; County opposed the motion.[22] County cannot be permitted to *oppose* reconsideration by the trial court in light of the new information, then obtain dismissal on the basis that reconsideration is no longer an available remedy.

In short, there was no deliberate and egregious misconduct; there were simply declarations submitted in an adversarial proceeding, which may have given the wrong impression on an issue because County never conducted discovery or attempted to dispute them. Dismissal was not the only way to guarantee a fair trial; County never attempted to obtain reconsideration when it could have. County should not be rewarded with a dismissal when its failure to question declarations, and its subsequent failure to seek reconsideration promptly after the new information came to light, were equally responsible for any perceived flaw in the procedure that resulted in Barragan obtaining relief from the TCA.

 2. *The Summary Judgment Must Be Reversed*

  A. *Standard of Review*

" 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107.) The pleadings define the issues to be considered on a motion for summary judgment. (*Sadlier v. Superior Court* (1986) 184 Cal.App.3d 1050, 1055.) As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of

---

[22] County had prevailed at the trial court; it apparently had a tactical reason to not stipulate to a remand for reconsideration. However, such tactical reasons disappeared after we issued our opinion on appeal, reversing the trial court's order. County filed a petition for reconsideration of our opinion; at no point did County suggest that the proper remedy was to remand to the trial court for reconsideration of the issue of excusable neglect in light of the newly disclosed information. (We take judicial notice of the appellate court file in the prior matter.)

17

fact.  (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065.)"  (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  We review orders granting or denying a summary judgment motion de novo.  (*FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 72; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579.) We exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law."  (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222.)

### B.     *Dangerous Condition of Public Property*

" '[A] public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, [and] that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred . . . . '  The plaintiff must also show that a negligent or wrongful act or omission of a public employee created the dangerous condition, *or* the public entity had actual or constructive notice of the dangerous condition a sufficient time prior to the injury to have taken measures to protect against it.  (Gov. Code, § 835.)" (*Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1194.)

In this case, we are concerned with the first element, whether the property was in a dangerous condition at the time of the accident.  "A 'dangerous condition' is defined as 'a condition of property that creates a substantial . . . risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used.'  [Citation.]  The existence of a dangerous condition is usually

18

a question of fact, but may be resolved as a question of law if reasonable minds can come to but one conclusion.  [Citations.]"[23]  (*Ibid.*)

"[A]ny property can be dangerous if used in a sufficiently improper manner.  For this reason, a public entity is only required to provide roads that are safe for reasonably foreseeable careful use.  [Citation.]  'If [] it can be shown that the property is safe when used with due care and that a risk of harm is created only when foreseeable users fail to exercise due care, then such property is not "dangerous" within the meaning of section 830, subdivision (a).'  [Citation.]"  (*Chowdhury v. City of Los Angeles, supra,* 38 Cal.App.4th at p. 1196.)  Nonetheless, the *plaintiff* need not have been using the property with due care in order to recover.  "When a plaintiff seeks to recover for injury caused by a dangerous condition of public property, ' "The Tort Claims Act does not require [the] plaintiff to prove that the property was actually being used with due care at the time of the injury, either by himself or by a third party (e.g., driver of automobile in which plaintiff was riding as a passenger)." '  [Citation.]"  (*Lane v. City of Sacramento, supra,* 183 Cal.App.4th at p. 1347.)  We therefore consider whether the condition of the property created a substantial risk of injury when used with due care in a reasonably foreseeable manner, regardless of whether Barragan used the property with due care.

A plaintiff alleging a dangerous condition of public property must establish a physical deficiency in the property itself, which foreseeably endangers those using the

---

[23]     Government Code section 830.2 provides:  "A condition is not a dangerous condition within the meaning of this chapter if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used."  "According to the official comments of the Law Revision Commission, while '[t]echnically . . . unnecessary,' section 830.2 'is included in the chapter to emphasize that the courts are required to determine that there is evidence from which a reasonable person could conclude that a substantial, as opposed to a possible, risk is involved before they may permit the jury to find that a condition is dangerous.'  [Citation.]"  (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1069, fn. 4.)

property. The property must be damaged or defective, or it must possess physical characteristics in its design, location, features, or relationship to its surroundings that endanger users. (*Mixon v. Pacific Gas & Electric Co.* (2012) 207 Cal.App.4th 124, 131.) In this case, Barragan alleges such deficiencies in the visibility/warnings of the curve, and the slope and composition of the dirt shoulder.

C.     *Triable Issues of Fact Exist Regarding the Dangerousness of the Curve*

The trial court concluded that the curve was not dangerous as a matter of law, on the basis that the "Curve" and "45 MPH" advisory signs sufficiently alerted a driver that a curve was approaching, and the reflective white line on the pavement sufficiently alerted a driver to the actual location of the curve. We conclude, however, that triable issues of fact exist.

First, the experts disagreed as to whether a reasonably foreseeable driver exercising due care would necessarily be driving with high beams; and neither party offered any evidence on the issue beyond an expert's conclusory opinion. Thus, a triable issue of fact existed as to whether a reasonably foreseeable driver exercising due care driving westbound on Palmdale Boulevard would be using high beams. If a driver could be using low beams and still be exercising due care, County's expert conceded that the driver would have approximately 150 feet of visual preview of the curve. That expert testified that 450 feet would be sufficient to successfully navigate the curve; there was no evidence that 150 feet would be sufficient.

Second, Barragan's accident reconstruction expert testified that, even with high beams, there is not 450 feet of visual preview of the curve – due to the change in elevation of the road as a driver approaches the curve. Indeed, both of Barragan's experts testified that a driver proceeding at the 45 mile per hour speed recommended by the sign would *not* have sufficient time to see the curve and safely navigate it. Thus, there was a triable issue of fact as to whether the 45 mile per hour sign in fact rendered the curve

20

more dangerous, rather than providing sufficient warning of it.**24** (See *Harland v. State of California* (1977) 75 Cal.App.3d 475, 485 [relying on evidence that a posted speed limit for a bridge was too high in view of the bridge's other hazards]; *De La Rosa v. City of San Bernardino* (1971) 16 Cal.App.3d 739, 746 ["although a public entity is not liable for failure to install traffic signs or signals [citation], when it undertakes to do so and invites public reliance upon them, it may be held liable for creating a dangerous condition in so doing"].)  Thus, triable issues of fact existed as to the dangerousness of the curve, and the trial court erred in granting summary judgment.

> D. *Triable Issues of Fact Exist Regarding the Dangerousness of the Slope and Composition of the Dirt Shoulder*

The experts presented by the County and Barragan disagreed as to whether the slope and composition of the dirt shoulder created a dangerous condition.  The parties seemed to agree that there was a strong slope to the dirt shoulder and that it was comprised of dirt rather than other shoulder material; they disagreed, however, as to whether reasonable engineers would construct the dirt shoulder as it had, in fact, been constructed.

The trial court did not address this dispute, however, because it concluded that Barragan had *conceded*, through the declaration of her expert, Royer, that the only time a driver would be on the dirt shoulder is if the driver was not exercising due care.  As there can be no dangerous condition if the property does not present a risk to drivers

---

**24**     County argues that, under the basic speed law (Veh. Code, § 22350), no driver exercising due care will drive faster than reasonable having due regard for visibility and other factors.  County takes the position that, as the white edge line is visible in a car's headlights, a driver is obligated to slow his or her vehicle enough so that the driver can safely turn within the area illuminated by the car's headlights.  Yet the issue is not so straightforward.  A curve can be sharp or gradual; the sharper the curve, the slower the necessary speed.  A driver alerted to a "45 MPH" curve may reasonably believe that the road will provide sufficient warning for the driver to enter the curve at that speed; the driver might not expect the white edge line to disappear when the road drops down immediately before the curve.

21

exercising due care, the trial court concluded that evidence of the risk presented by the shoulder was simply not relevant in light of this concession.

We find no such concession. Royer testified that "[t]raffic engineers anticipate that motorists will not always use reasonable and proper caution or be attentive and will depart the travelled roadway particularly at the outside of a curve; therefore, the engineers plan accordingly." First, Royer did not testify that *only* drivers who do not use proper caution or attentiveness will depart the roadway; he simply testified that some such drivers do. Second, even if Royer's statement can be interpreted to mean that the only drivers who leave the road are those who do "not . . . use reasonable and proper caution or [are not being] attentive," it does not mean that the only drivers who leave the road are not *exercising due care*. A driver can become momentarily inattentive for any number of reasons outside the driver's control; this does not mandate the conclusion that the inattentive driver was not exercising due care. Third, Barragan did not rely solely on Royer's testimony. She introduced the testimony of her accident reconstruction expert, who stated that, "[d]rivers, in general, tend to run off the road at the outside of a curve." There was no qualification to this statement suggesting that the *only* drivers who run off the road at the outside of a curve are not exercising due care; to the contrary, he testified that the shoulder created a "dangerous condition for the motoring public when used with due care." Taken together, the testimony of Barragan's experts did not constitute a concession on the part of Barragan that the only drivers who leave the road are those who are not exercising due care.[25]

Moreover, such a concession would be contrary to reason and the law. It is foreseeable that a driver may leave the road for any number of reasons, including losing control of the vehicle, momentary distraction, and illness. (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 768, 775.) In *Zeppi v. State of California* (1959) 174 Cal.App.2d 484, 486, the court concluded that "the existence of a drop from the level of the pavement to the adjacent 'freshly plowed or graded shoulder' undoubtedly could be found to be

---

[25]     Certainly, County did not proffer this as an undisputed fact in its separate statement.

22

a dangerous condition . . . . " Similarly, in *Breslin v. Fredrickson* (1957) 152 Cal.App.2d 780, 785, the court concluded that "the existence of the sudden drop from the level of the pavement to the adjacent shoulder constituted what the jury could have concluded was a dangerous condition . . . . "

Finally, we note that the theory of Barragan's case is that the dangerousness of the curve operated in conjunction with the dangerousness of the shoulder. In other words, Barragan's evidence was that she drove onto the soft shoulder of the road *because* she missed the entry to the insufficiently-visible curve. As a triable issue of fact exists as to the dangerousness of the curve, it follows that a triable issue of fact exists as to whether a driver exercising due care could miss the curve and end up on the shoulder.

As it has not been established that the only drivers who leave the paved road and enter the shoulder are those not exercising due care, and there is a triable issue of fact as to whether the dirt shoulder otherwise constituted a dangerous condition, the trial court erred in granting summary judgment.

## DISPOSITION

The judgment is reversed.  Barragan shall recover her costs on appeal.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

ALDRICH, J.

WE CONCUR:


KITCHING, Acting P. J.


EDMON, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.